## ARCHER ET UX. *v.* WARNER

No. 01–1418.   Argued January 13, 2003—Decided March 31, 2003

BREYER, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and O'CONNOR, SCALIA, KENNEDY, SOUTER, and GINSBURG, JJ., joined. THOMAS, J., filed a dissenting opinion, in which STEVENS, J., joined, *post*, p. 323.

*Craig Goldblatt* argued the cause for petitioners. With him on the briefs was *Seth P. Waxman.*

*Lisa Schiavo Blatt* argued the cause for the United States as *amicus curiae* urging reversal. With her on the brief were *Solicitor General Olson, Assistant Attorney General*

*McCallum, Deputy Solicitor General Clement, William Kanter,* and *Robert Kamenshine.*

*Donald B. Ayer* argued the cause for respondent. With him on the brief were *Jack W. Campbell IV* and *Rayford K. Adams III.**

JUSTICE BREYER delivered the opinion of the Court.

The Bankruptcy Code provides that a debt shall not be dischargeable in bankruptcy "to the extent" it is "for money . . . obtained by . . . false pretenses, a false representation, or actual fraud." 11 U. S. C. § 523(a)(2)(A). Can this language cover a debt embodied in a settlement agreement that settled a creditor's earlier claim "for money . . . obtained by . . . fraud"? In our view, the statute can cover such a debt, and we reverse a lower court judgment to the contrary.

I

This case arises out of circumstances that we outline as follows: (1) *A* sues *B* seeking money that (*A* says) *B* obtained

*Briefs of *amici curiae* urging reversal were filed for the State of Ohio et al. by *Betty D. Montgomery,* Attorney General of Ohio, *David M. Gormley,* State Solicitor, and *Marcus J. Glasgow* and *John K. McManus,* Assistant Attorneys General, and by the Attorneys General for their respective jurisdictions as follows: *Bruce M. Botelho* of Alaska, *Janet Napolitano* of Arizona, *Bill Lockyer* of California, *M. Jane Brady* of Delaware, *Robert A. Butterworth* of Florida, *Thurbert E. Baker* of Georgia, *Alan G. Lance* of Idaho, *James E. Ryan* of Illinois, *Steve Carter* of Indiana, *Thomas J. Miller* of Iowa, *Thomas F. Reilly* of Massachusetts, *Mike Hatch* of Minnesota, *Mike Moore* of Mississippi, *Jeremiah W. (Jay) Nixon* of Missouri, *Frankie Sue Del Papa* of Nevada, *David Samson* of New Jersey, *Eliot Spitzer* of New York, *Roy Cooper* of North Carolina, *Wayne Stenehjem* of North Dakota, *Robert Tenorio Torres* of the Northern Mariana Islands, *W. A. Drew Edmondson* of Oklahoma, *Hardy Myers* of Oregon, *D. Michael Fisher* of Pennsylvania, *Anabelle Rodríguez* of Puerto Rico, *Paul G. Summers* of Tennessee, *John Cornyn* of Texas, *Mark L. Shurtleff* of Utah, *Christine O. Gregoire* of Washington, and *Hoke MacMillan* of Wyoming; for AARP by *Walter Dellinger, Jonathan D. Hacker, Stacy J. Canan, Deborah M. Zuckerman,* and *Michael R. Schuster;* and for G. Eric Brunstad, Jr., by *Mr. Brunstad, pro se,* and *Rheba Rutkowski.*

through fraud; (2) the parties settle the lawsuit and release related claims; (3) the settlement agreement does not resolve the issue of fraud, but provides that $B$ will pay $A$ a fixed sum; (4) $B$ does not pay the fixed sum; (5) $B$ enters bankruptcy; and (6) $A$ claims that $B$'s obligation to pay the fixed settlement sum is nondischargeable because, like the original debt, it is for "money . . . obtained by . . . fraud."

This outline summarizes the following circumstances: In late 1991, Leonard and Arlene Warner bought the Warner Manufacturing Company for $250,000. About six months later they sold the company to Elliott and Carol Archer for $610,000. A few months after that the Archers sued the Warners in North Carolina state court for (among other things) fraud connected with the sale.

In May 1995, the parties settled the lawsuit. The settlement agreement specified that the Warners would pay the Archers "$300,000.00 less legal and accounting expenses" "as compensation for emotional distress/personal injury type damages." App. 61. It added that the Archers would "execute releases to any and all claims . . . arising out of this litigation, except as to amounts set forth in [the] Settlement Agreement." *Id.*, at 63. The Warners paid the Archers $200,000 and executed a promissory note for the remaining $100,000. The Archers executed releases "discharg[ing]" the Warners "from any and every right, claim, or demand" that the Archers "now have or might otherwise hereafter have against" them, "excepting only obligations under" the promissory note and related instruments. *Id.*, at 67; see also *id.*, at 70. The releases, signed by all parties, added that the parties did not "admi[t] any liability or wrongdoing," that the settlement was "the compromise of disputed claims, and that payment [was] not to be construed as an admission of liability." *Id.*, at 67–68, 71. A few days later the Archers voluntarily dismissed the state-court lawsuit with prejudice.

In November 1995, the Warners failed to make the first payment on the $100,000 promissory note. The Archers

sued for the payment in state court. The Warners filed for bankruptcy. The Bankruptcy Court ordered liquidation under Chapter 7 of the Bankruptcy Code. And the Archers brought the present claim, asking the Bankruptcy Court to find the $100,000 debt nondischargeable, and to order the Warners to pay the $100,000. Leonard Warner agreed to a consent order holding his debt nondischargeable. Arlene Warner contested nondischargeability. The Archers argued that Arlene Warner's promissory note debt was nondischargeable because it was for "money . . . obtained by . . . fraud."

The Bankruptcy Court, finding the promissory note debt dischargeable, denied the Archers' claim. The District Court affirmed the Bankruptcy Court. And the Court of Appeals for the Fourth Circuit, dividing two to one, affirmed the District Court. 283 F. 3d 230 (2002). The majority reasoned that the settlement agreement, releases, and promissory note had worked a kind of "novation." This novation replaced (1) an original potential debt to the Archers for money obtained by fraud with (2) a new debt. The new debt was not for money obtained by fraud. It was for money promised in a settlement contract. And it was consequently dischargeable in bankruptcy.

We granted the Archers' petition for certiorari, 536 U. S. 938 (2002), because different Circuits have come to different conclusions about this matter, compare *In re West*, 22 F. 3d 775, 778 (CA7 1994) (supporting the novation theory), with *United States* v. *Spicer*, 57 F. 3d 1152, 1155 (CADC 1995) ("The weight of recent authority rejects" the novation theory), cert. denied, 516 U. S. 1043 (1996).

## II

We agree with the Court of Appeals and the dissent, *post*, at 324–325 (opinion of THOMAS, J.), that "[t]he settlement agreement and promissory note here, coupled with the broad language of the release, completely addressed and released

each and every underlying state law claim." 283 F. 3d, at 237. That agreement left only one relevant debt: a debt for money promised in the settlement agreement itself. To recognize that fact, however, does not end our inquiry. We must decide whether that same debt can *also* amount to a debt for *money obtained by fraud*, within the terms of the nondischargeability statute. Given this Court's precedent, we believe that it can.

*Brown* v. *Felsen*, 442 U. S. 127 (1979), governs the outcome here. The circumstances there were the following: (1) Brown sued Felsen in state court seeking money that (Brown said) Felsen had obtained through fraud; (2) the state court entered a consent decree embodying a stipulation providing that Felsen would pay Brown a certain amount; (3) neither the decree nor the stipulation indicated the payment was for fraud; (4) Felsen did not pay; (5) Felsen entered bankruptcy; and (6) Brown asked the Bankruptcy Court to look behind the decree and stipulation and to hold that the debt was nondischargeable because it was a debt for money obtained by fraud. *Id.*, at 128–129.

The lower courts had held against Brown. They pointed out that the relevant debt was for money owed pursuant to a consent judgment; they noted that the relevant judgment-related documents did not refer to fraud; they added that the doctrine of res judicata prevented the Bankruptcy Court from looking behind those documents to uncover the nature of the claim that had led to their creation; and they consequently concluded that the relevant debt could not be characterized as one for money obtained by fraud. *Id.*, at 130–131.

This Court unanimously rejected the lower court's reasoning. The Court conceded that the state law of claim preclusion would bar Brown from making any claim " 'based on the same cause of action' " that Brown had brought in state court. *Id.*, at 131 (quoting *Montana* v. *United States*, 440 U. S. 147, 153 (1979)). Indeed, this aspect of res judicata would prevent Brown from litigating "all grounds for . . .

recovery" previously available to Brown, whether or not Brown had previously "asserted" those grounds in the prior state-court "proceeding." 442 U. S., at 131. But all this, the Court held, was beside the point. Claim preclusion did not prevent the Bankruptcy Court from looking beyond the record of the state-court proceeding and the documents that terminated that proceeding (the stipulation and consent judgment) in order to decide whether the debt at issue (namely, the debt embodied in the consent decree and stipulation) was a debt for money obtained by fraud. *Id.;* at 138–139.

As a matter of logic, *Brown*'s holding means that the Fourth Circuit's novation theory cannot be right. The reduction of Brown's state-court fraud claim to a stipulation (embodied in a consent decree) worked the same kind of novation as the "novation" at issue here. (Despite the dissent's suggestions to the contrary, *post,* at 327, it did so by an agreement of the parties that would seem to have "sever[ed] the causal relationship," *ibid.,* between liquidated debt and underlying fraud no more and no less than did the settlement and releases at issue here.) Yet, in *Brown,* this Court held that the Bankruptcy Court should look behind that stipulation to determine whether it reflected settlement of a valid claim for fraud. If the Fourth Circuit's view were correct—if reducing a fraud claim to settlement definitively changed the nature of the debt for dischargeability purposes—the nature of the debt in *Brown* would have changed similarly, thereby rendering the debt dischargeable. This Court's instruction that the Bankruptcy Court could "weigh all the evidence," 442 U. S., at 138, would have been pointless. There would have been nothing for the Bankruptcy Court to examine.

Moreover, the Court's language in *Brown* strongly favors the Archers' position here. The Court said that "the mere fact that a conscientious creditor has previously reduced his claim to judgment should not bar further inquiry into the

true nature of the debt." *Ibid.*; accord, *Grogan* v. *Garner*, 498 U. S. 279, 290 (1991) (assuming that the Bankruptcy Code seeks to "permit exception from discharge of all fraud claims creditors have successfully reduced to judgment"). If we substitute the word "settlement" for the word "judgment," the Court's statement describes this case.

Finally, the Court's basic reasoning in *Brown* applies here. The Court pointed out that the Bankruptcy Code's nondischargeability provision had originally covered "only 'judgments' sounding in fraud." 442 U. S., at 138. Congress later changed the language so that it covered all such " 'liabilities.' " *Ibid.* This change indicated that "Congress intended the fullest possible inquiry" to ensure that "all debts arising out of" fraud are "excepted from discharge," no matter what their form. *Ibid.*; see also 11 U. S. C. § 523(a) (current "any debt" language). Congress also intended to allow the relevant determination (whether a debt arises out of fraud) to take place in bankruptcy court, not to force it to occur earlier in state court at a time when nondischargeability concerns "are not directly in issue and neither party has a full incentive to litigate them." *Brown*, 442 U. S., at 134.

The only difference we can find between *Brown* and the present case consists of the fact that the relevant debt here is embodied in a settlement, not in a stipulation and consent judgment. But we do not see how that difference could prove determinative. The dischargeability provision applies to all debts that "aris[e] out of" fraud. *Id.*, at 138; see also *Cohen* v. *de la Cruz*, 523 U. S. 213, 215 (1998). A debt embodied in the settlement of a fraud case "arises" no less "out of" the underlying fraud than a debt embodied in a stipulation and consent decree. Policies that favor the settlement of disputes, like those that favor "repose," are neither any more nor any less at issue here than in *Brown*. See 442 U. S., at 133–135. In *Brown*, the doctrine of res judicata itself ensured "a blanket release" of the underlying claim of fraud, just as the contractual releases did here, *post*, at 324.

See *supra,* at 318–319. Despite the dissent's protests to the contrary, *post,* at 323–327, what has *not* been established here, as in *Brown,* is that the parties meant to resolve the *issue* of fraud or, more narrowly, to resolve that issue for purposes of a later claim of nondischargeability in bankruptcy. In a word, we can find no significant difference between *Brown* and the case now before us.

Arlene Warner argues that we should affirm the Court of Appeals' decision on alternative grounds. She says that the settlement agreement and releases not only worked a novation by converting potential tort liabilities into a contract debt, but also included a promise that the Archers would not make the present claim of nondischargeability for fraud. She adds that, in any event, because the Archers dismissed the original fraud action with prejudice, North Carolina law treats the fraud issue as having been litigated and determined in her favor, thereby barring the Archers from making their present claim on grounds of collateral estoppel. But cf. *Arizona* v. *California,* 530 U. S. 392, 414 (2000) ("[S]ettlements ordinarily occasion no *issue preclusion . . .* unless it is clear . . . that the parties intend their agreement to have such an effect").

Without suggesting that these additional arguments are meritorious, we note that the Court of Appeals did not determine the merits of either argument, both of which are, in any event, outside the scope of the question presented and insufficiently addressed below. See *Roberts* v. *Galen of Va., Inc.,* 525 U. S. 249, 253–254 (1999) *(per curiam).* We choose to leave initial evaluation of these arguments to "[t]he federal judges who deal regularly with questions of state law in their respective districts and circuits," and who "are in a better position than we," *Butner* v. *United States,* 440 U. S. 48, 58 (1979), to determine, for example, whether the parties intended their agreement and dismissal to have issue-preclusive, as well as claim-preclusive, effect, and to what extent such preclusion applies to enforcement of a debt spe-

cifically excepted from the releases, *supra*, at 317; *post*, at 325. The Court of Appeals remains free, on remand, to determine whether such questions were properly raised or preserved, and, if so, to decide them.

We conclude that the Archers' settlement agreement and releases may have worked a kind of novation, but that fact does not bar the Archers from showing that the settlement debt arose out of "false pretenses, a false representation, or actual fraud," and consequently is nondischargeable, 11 U. S. C. § 523(a)(2)(A). We reverse the Court of Appeals' judgment to the contrary. And we remand this case for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE THOMAS, with whom JUSTICE STEVENS joins, dissenting.

Section 523(a)(2) of the Bankruptcy Code excepts from discharge "any debt . . . for money, property, [or] services, . . . to the extent *obtained by* . . . false pretenses, a false representation, or actual fraud." 11 U. S. C. § 523(a)(2)(A) (emphasis added). The Court holds that a debt owed under a settlement agreement was "obtained by" fraud even though the debt resulted from a contractual arrangement pursuant to which the parties agreed, using the broadest language possible, to release one another from "any and every right, claim, or demand . . . arising out of" a fraud action filed by petitioners in North Carolina state court. App. 67. Because the Court's conclusion is supported neither by the text of the Bankruptcy Code nor by any of the agreements executed by the parties, I respectfully dissent.

The Court begins its description of this case with the observation that "the settlement agreement does not *resolve* the issue of fraud, but provides that *B* will pay *A* a fixed sum." *Ante*, at 317 (emphasis added). Based on that erroneous premise, the Court goes on to find that there is "no significant difference between *Brown* [v. *Felsen*, 442 U. S. 127

(1979),] and [this case]." *Ante*, at 322. The only distinction, the Court explains, is that "the relevant debt here is embodied in a settlement, not in a stipulation and consent judgment" as in *Brown* v. *Felsen*, 442 U. S. 127 (1979). *Ante*, at 321.

Remarkably, however, the Court fails to address the critical difference between this case and *Brown:* The parties here executed a blanket release, rather than entered into a consent judgment. And, in my view, "if it is shown that [a] note was given and received as payment or waiver of the original debt and the parties agreed that the note was to substitute a new obligation for the old, the note fully discharges the original debt, and the nondischargeability of the original debt does not affect the dischargeability of the obligation under the note." *In re West*, 22 F. 3d 775, 778 (CA7 1994). That is the case before us, and, accordingly, *Brown* does not control our disposition of this matter.

In *Brown*, Brown sued Felsen in state court, alleging that Felsen had fraudulently induced him to act as guarantor on a bank loan. 442 U. S., at 128. The suit was settled by stipulation, which was incorporated by the court into a consent judgment, but "[n]either the stipulation nor the resulting judgment indicated the cause of action on which respondent's liability to petitioner was based." *Ibid.* The Court held that principles of res judicata did not bar the Bankruptcy Court from looking behind the consent judgment and stipulation to determine the extent to which the debt was "obtained by" fraud. The Court concluded that it would upset the policy of the Bankruptcy Code for "state courts to decide [questions of nondischargeability] at a stage when they are not directly in issue and neither party has a full incentive to litigate them." *Id.*, at 134. *Brown* did not, however, address the question presented in this case—whether a creditor may, *without the participation of the state court*, completely release a debtor from "any and every right, claim, or demand . . . relating to" a state-court fraud action. App. 67.

Based on the sweeping language of the general release, it is inaccurate for the Court to say that the parties did not "resolve the issue of fraud." *Ante,* at 317. To be sure, as in *Brown,* there is no legally controlling document stating that respondent did (or did not) commit fraud. But, unlike in *Brown,* where it was not clear which claims were being resolved by the consent judgment, the release in this case clearly demonstrates that the parties intended to resolve conclusively not only the issue of fraud, but also any other "right[s], claim[s], or demand[s]" related to the state-court litigation, "excepting only obligations under [the] Note and deeds of trust."[1] App. 67. See *McNair* v. *Goodwin,* 262 N. C. 1, 7, 136 S. E. 2d 218, 223 (1964) ("'[A] compromise agreement is conclusive between the parties as to the matters compromised'" (quoting *Penn Dixie Lines* v. *Grannick,* 238 N. C. 552, 556, 78 S. E. 2d 410, 414 (1953))).

The fact that the parties intended, by the language of the general release, to replace an "old" fraud debt with a "new" contract debt is an important distinction from *Brown,* for the text of the Bankruptcy Code prohibits discharge of any debt "to the extent *obtained by*" fraud. 11 U. S. C. § 523(a)(2) (emphasis added). In interpreting this provision, the Court has recognized that, in order for a creditor to establish that a debt is not dischargeable, he must demonstrate that there is a causal nexus between the fraud and the debt. See *Cohen* v. *de la Cruz,* 523 U. S. 213, 218 (1998) (describing § 523(a)(2)(A) as barring discharge of debts "'resulting from'" or "'traceable to'" fraud (quoting *Field* v. *Mans,* 516 U. S. 59, 61, 64 (1995))). Indeed, petitioners conceded at oral argument that the "obtained by" language of § 523(a)(2) requires a creditor to prove that a debtor's fraud is the proximate cause of the debt. Tr. of Oral Arg. 10, 12; see also 1 Am. Jur. 2d, Actions § 57, p. 760 (1994) ("What is essential is that the wrongful act charged be the proximate cause of the

---

[1] There are no allegations that petitioners were fraudulently induced to execute the settlement agreement or the general release.

damage; the loss must be *the direct result of, or proximately traceable to,* the breach of an obligation owing to the plaintiff" (emphasis added)).

This Court has been less than clear with respect to the requirements for establishing proximate cause. In the past, the Court has applied the term "'proximate cause' to label generically the judicial tools used to limit a person's responsibility for the consequences of that person's own acts." *Holmes* v. *Securities Investor Protection Corporation,* 503 U. S. 258, 268 (1992). The Court has explained that, "[a]t bottom, the notion of proximate cause reflects 'ideas of what justice demands, or of what is administratively possible and convenient.'" *Ibid.* (quoting W. Keeton, D. Dobbs, R. Keeton, & D. Owen, Prosser and Keeton on Law of Torts § 41, p. 264 (5th ed. 1984) (hereinafter Keeton)); see also *Palsgraf* v. *Long Island R. R. Co.,* 248 N. Y. 339, 352, 162 N. E. 99, 103 (1928) (Andrews, J., dissenting) ("What we do mean by the word 'proximate' is, that because of convenience, of public policy, of a rough sense of justice, the law arbitrarily declines to trace a series of events beyond a certain point"). While the concept of proximate cause is somewhat amorphous, see Keeton 279, the common law is clear that certain intervening events—otherwise called "superseding causes"—are sufficient to sever the causal nexus and cut off all liability. See *Exxon Co., U. S. A.* v. *Sofec, Inc.,* 517 U. S. 830, 837 (1996) ("'The doctrine of superseding cause is ... applied where the defendant's negligence in fact substantially contributed to the plaintiff's injury, but the injury was actually brought about by a later cause of independent origin that was not foreseeable'" (quoting 1 T. Schoenbaum, Admiralty and Maritime Law § 5–3, pp. 165–166 (2d ed. 1994))); 57A Am. Jur. 2d, Negligence § 790, p. 701 (1989) ("The intervention, between the negligence of the defendant and the occurrence of an injury to the plaintiff, of a new, independent, and efficient cause, or of a superseding cause, of the injury renders the negligence of the defendant a remote cause of

the injury, and he cannot be held liable, notwithstanding the existence of some connection between his negligence and the injury").

In this case, we are faced with the novel situation where the parties have, by agreement, attempted to sever the causal relationship between the debtor's fraudulent conduct and the debt.[2] In my view, the "intervening" settlement and release create the equivalent of a superseding cause, no different from the intervening negligent acts of a third party in a negligence action. In this case, the parties have made clear their intent to replace the old "fraud" debt with a new "contract" debt. Accordingly, the only debt that remains intact for bankruptcy purposes is the one "obtained by" voluntary agreement of the parties, not by fraud.

Petitioners' own actions in the course of this litigation support this conclusion. Throughout the proceedings below and continuing in this Court, petitioners have sought to recover only the amount of the debt set forth in the settlement agreement, which is lower than the total damages they allegedly suffered as a result of respondent's alleged fraud. See Brief for Petitioners 21 ("[T]he nondischargeability action was brought solely in order to enforce the agreement to pay [the amount in the settlement agreement]"). This crucial fact demonstrates that petitioners seek to recover a debt based only in contract, not in fraud.

---

[2] Petitioners argue that *any* prepetition waiver of nondischargeability protections should be deemed unenforceable because it is inconsistent with the Bankruptcy Code and impairs the rights of third-party creditors. Brief for Petitioners 24. As respondent points out, however, a creditor forfeits the right to contest dischargeability if it fails to affirmatively request a hearing within 60 days after the first date set for the meeting of the creditors. See 11 U. S. C. § 523(c)(1); Fed. Rule Bkrtcy. Proc. 4007(c). Thus, presumably, creditors may choose, for any or no reason at all, to forgo an assertion of nondischargeability under § 523(a)(2). Indeed, petitioners have failed to point to *any* provision of the Bankruptcy Code that specifically bars a creditor from entering into an agreement that impairs its right to contest dischargeability.

The Court concludes otherwise. The Court, however, does not explain why it permits petitioners to look at the settlement agreement for the amount of the debt they seek to recover but not for the character of that debt. Neither this Court's precedents nor the text of the Bankruptcy Code permits such a selective implementation of a valid agreement between the parties.

\*      \*      \*

The Court today ignores the plain intent of the parties, as evidenced by a properly executed settlement agreement and general release, holding that a debt owed by respondent under a contract was "obtained by" fraud. Because I find no support for the Court's conclusion in the text of the Bankruptcy Code, or in the agreements of the parties, I respectfully dissent.