In re AMERICAN WAGERING,
INC., Debtor.

In re Leroy's Horse and Sports
Place, Debtor.

American Wagering, Inc.; Leroy's
Horse and Sports Place,
Appellants,

v.

Michael Racusin, dba M. Racusin
& Co., Appellee.

BAP No. NV–04–1029–BuBS.
Bankruptcy Nos. 03–52529, 03–52530.
Adversary No. 03–05804.

United States Bankruptcy Appellate Panel
of the Ninth Circuit.

Argued and Submitted on Oct. 21,
2004 at Las Vegas, Nevada.

Filed—April 14, 2005.

Thomas H. Fell, Gordon & Silver, Ltd., Las Vegas, NV, for American Wagering, Inc.

Jennifer A. Smith, Lionel, Sawyer & Collins, Reno, NV, for Michael Racusin.

Before: BUFFORD,[1] BRANDT, and SMITH, Bankruptcy Judges.

## OPINION

BUFFORD, Bankruptcy Judge.

The issue in this appeal is whether the claim of a consultant to the debtors, who contracted to receive most of his compensation in equity instead of cash, is properly subject to § 510(b)[2] subordination where the equity portion of the claim was reduced to a money judgment on the eve of bankruptcy. The bankruptcy court found that the claim was not subject to subordination. WE REVERSE.

## I. RELEVANT FACTS

Debtor Leroy's Horse & Sports Place ("Leroy's") hired appellant Racusin in 1994 as a financial advisor in connection with an initial public offering ("IPO") of Leroy's stock. As compensation for the financial

---

1. Hon. Samuel Bufford, Bankruptcy Judge for the Central District of California, sitting by designation.

2. Unless otherwise indicated, all chapter, section and rule references are to the Bankruptcy Code, 11 U.S.C. §§ 101–1330 (West 1999) and to the Federal Rules of Bankruptcy Procedure, Rules 1001–9036.

advice, Racusin contracted for "4.5 percent of the final evaluation in the form of Leroy's common stock and $150,000 in cash." The value of the 4.5 percent share, as found by a district court jury, was $2,025,000 (4.5% of the $45 million final valuation of the IPO).

In preparation for the IPO, Leroy's formed debtor American Wagering Inc. ("AWI") and became its subsidiary so that AWI would become the publicly-owned entity after the IPO.[3]

While the IPO was pending, Leroy's brought suit against Racusin in 1996 for a determination that the contract was unenforceable. Racusin counterclaimed for breach of contract, breach of the covenant of good faith and fair dealing and unjust enrichment. After a bench trial, the district court granted judgment to Racusin for $732,972. The Ninth Circuit reversed and remanded on the grounds that Racusin was entitled to a jury trial. *See Leroy's Horse & Sports Place v. Racusin*, 182 F.3d 926 (9th Cir.1999).

On remand, Racusin obtained judgment on a jury verdict for $150,000 plus 4.5 percent of the AWI stock. On Racusin's appeal objecting to the award of stock, the Ninth Circuit reversed again: it found that the trial court could only award damages because Racusin's complaint had only re-quested damages, not stock. *See Leroy's Horse & Sports Place v. Racusin*, 21 Fed. Appx. 716 (9th Cir.2001).

On the second remand, the district court awarded Racusin damages of $2,310,000, consisting of the contractual cash payment of $150,000 (which has since been paid) plus $2,160,000, the value of the AWI stock in 1996 when Racusin could have legally sold it.[4]

On July 25, 2003, a few days after the district court decision, AWI and Leroy's filed the underlying chapter 11 cases, which are consolidated for administrative purposes. Racusin filed a claim for $2,275,012 based on his district court judgment (which presumably included his claim for interest that is on appeal).

The debtors brought an adversary proceeding against Racusin, alleging that his claim for the portion of the debt representing 4.5% equity in AWI is "for damages arising from the purchase or sale of . . . a security," that must be subordinated to the claims of creditors pursuant to § 510(b).[5] The bankruptcy court granted summary judgment to Racusin and denied the cross motion of Leroy's and AWI. Leroy's and AWI have brought this appeal.

## II. JURISDICTION

The bankruptcy court had jurisdiction via 28 U.S.C. §§ 1334 and 157(b)(1). We

---

**3.** Before going public, AWI became the holding company for other valuable subsidiaries. The record does not indicate that Racusin was entitled to compensation with respect to these entities, also. However, this issue is not germane to this appeal, which concerns only the subordination of the debt at issue.

**4.** In a third appeal, the Ninth Circuit determined that Racusin should be awarded prejudgment interest from Leroy's on the $2,160,000 award and remanded the matter to district court for a determination of the appropriate amount of prejudgment interest. See *Hartunian v. Racusin,* 120 Fed.Appx. 698 (2005).

**5.** Section 510(b) provides:

> For the purpose of distribution under this title, a claim arising from rescission of a purchase or sale of a security of the debtor or of an affiliate of the debtor, for damages arising from the purchase or sale of such a security, or for reimbursement or contribution allowed under section 502 on account of such a claim, shall be subordinated to all claims or interests that are senior to or equal the claim or interest represented by such security, except that if such security is common stock, such claim has the same priority as common stock.

have jurisdiction under 28 U.S.C. § 158(a)(1).

## III. STANDARD OF REVIEW

We review *de novo* a bankruptcy court's grant of summary judgment. *In re Bakersfield Westar Ambulance, Inc.*, 123 F.3d 1243, 1245 (9th Cir.1997).

## IV. DISCUSSION

### A. Statutory Language

Our analysis must begin with the statutory language. *See, e.g., United States v. Ron Pair Enterprises, Inc.*, 489 U.S. 235, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989).

■ Section 510(b) mandates the subordination of "a claim ... for damages arising from the purchase or sale of ... a security." Accordingly, when a claim for damages arises from the purchase or sale of stock, that claim must be subordinated to the claims of general unsecured creditors (as well as to any claims of more senior shareholders). *American Broadcasting Sys., Inc. v. Nugent (In re Betacom of Phoenix, Inc.)*, 240 F.3d 823 (9th Cir.2001).

■ Section 510(b) is based on the general principle of corporate law that creditors are entitled to be paid ahead of shareholders in the distribution of corporate assets. *See, e.g.*, DEL. CODE ANN. tit. 8, § 281(a), (b) (2004); NEV. REV. STAT. 78.610 (2004). This policy applies to defrauded shareholders as well: "[t]he general rule is that equity prefers the claims of innocent general creditors over the claims of shareholders ... deceived by officers of the corporation." *In re PT–1 Communications, Inc.*, 304 B.R. 601, 607 (Bankr. E.D.N.Y.2004) (subordinating claim of investor who was wrongfully omitted in the issuance of stock). Section 510(b) essentially serves to prevent a disappointed shareholder from recouping the shareholder's investment on parity with unsecured creditors. *See In re Alta + Cast, LLC*, 301 B.R. 150, 154 (Bankr.D.Del.2003). Thus, the bankruptcy code properly provides for shareholder claims to be subordinated to those of creditors. *See Betacom*, 240 F.3d at 830–31.

### B. Procedural Issues

Before addressing the merits of this appeal, we take up three procedural matters.

### 1. Looking Behind the Prepetition Judgment

The parties agree that it is appropriate for this Panel to look behind Racusin's district court judgment, and to examine the underlying facts in determining whether Racusin's claim should be subordinated. This accord rests on solid grounds. In construing other provisions of the bankruptcy code, the United States Supreme Court has found it appropriate to look behind the disposition (whether by judgment or settlement) of underlying prepetition proceedings between a creditor and the debtor.

For example, *Brown v. Felsen*, 442 U.S. 127, 99 S.Ct. 2205, 60 L.Ed.2d 767 (1979), involved a prepetition stipulation and consent judgment resolving claims between the parties that included a fraud claim. The lower courts had found that the claim was dischargeable (under prior bankruptcy law) because the underlying settlement did not specify the claims on which it was based. The Supreme Court reversed and held that, "the bankruptcy court is not confined to a review of the judgment and record in the prior ... proceedings when considering the dischargeability of respondent's debt." *Id.* at 138–39, 99 S.Ct. 2205.

A more recent case, *Archer v. Warner*, 538 U.S. 314, 123 S.Ct. 1462, 155 L.Ed.2d 454 (2003), involved lower court findings

that the settlement of a fraud claim, which included mutual releases and a new promissory note, constituted a novation that replaced the fraud claim and was dischargeable. The Supreme Court again reversed stating, "[w]e conclude that the ... settlement agreement and releases may have worked a kind of novation, but that fact does not bar the [creditors] from showing that the settlement debt arose out of ... fraud, and consequently is nondischargeable." *Id.* at 323, 123 S.Ct. 1462.

*Weissmann v. Pre–Press Graphics Co. (In re Pre–Press Graphics Co.),* 307 B.R. 65 (N.D.Ill.2004), applied these principles from *Brown* and *Archer* to the § 510(b) context. In *Pre–Press Graphics,* the bankruptcy court had found that the claim was subject to § 510(b) subordination because the claimant's prepetition judgment was "inextricably intertwined" with his shareholder status. *See id.* at 70. The district court affirmed based on *Brown* and *Archer. See id.* at 72–80.

While agreeing that this Panel should look behind the prepetition judgment in Racusin's favor in this case, the parties disagree on what we will find when we take that look. The debtors contend that we should find a securities transaction that is subject to § 510(b) subordination. Racusin contends that we should find an employment agreement that is not subject to subordination.

## 2. Money Damages

■ Racusin emphasizes that he sought only money damages from the debtors in his lawsuit, and not stock, and that he began his legal action nearly seven years before the bankruptcy case was filed. Racusin contends that, by seeking money damages based on the value of the stock at the completion of the IPO and by promptly asserting his claim, he has behaved like a creditor rather than an investor. Thus, he argues, his claim is inappropriate for subordination.

We are not persuaded by this argument. By its terms, § 510(b) applies to a claim for damages. Because of this statutory language, the fact that Racusin sought damages, not stock, in his underlying prepetition litigation provides no assistance in deciding whether his claim is subject to § 510(b) subordination. A claim for damages clearly can come within the ambit of § 510(b).

Furthermore, Racusin cannot change the nature of his claim, for § 510(b) purposes, by the expedient of limiting the prayer in his counterclaim in the district court litigation to cash rather than stock. *See Alta + Cast,* 301 B.R. at 155. Indeed, the purpose of § 510(b) would be completely undermined were we to allow Racusin to jump into line with the creditors and ahead of the other shareholders merely by filing a lawsuit and limiting his claim to damages rather than stock.

## 3. Reduction to Judgment

■ Appellees argue that Racusin's equity interest in this case was replaced with a money judgment before these consolidated cases were filed. We find that the bankruptcy code makes this distinction irrelevant.

Racusin filed a claim in these consolidated bankruptcy cases. Section 101(5) defines what constitutes a claim, wherever this term is used in the bankruptcy code. This section provides in relevant part:

"claim" means—

(A) right to payment, *whether or not such right is reduced to judgment,* liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisput-

ed, legal, equitable, secured, or unsecured . . . .

*Id.* (emphasis added).

This definition makes it clear that the status of a claim in a bankruptcy case turns on a right to payment. In contrast, it rejects altogether any consideration of whether this right has been. reduced to judgment. Pursuant to this provision, the reduction to judgment of a right to payment is irrelevant in determining its status as a claim.

"Claim" in § 510(b) has the meaning provided in § 101(5). Thus, as provided in § 105(b), its status in unaffected by its reduction to judgment. In consequence, we find that Racusin's having reduced his claim to judgment before the underlying bankruptcy cases were filed is irrelevant to the issues before us.

## C. Case Law

Our statutory analysis is supported both by controlling case law in the Ninth Circuit and by case law from other circuits.

### 1. Ninth Circuit Precedent

In *American Broadcasting Sys., Inc. v. Nugent (In re Betacom of Phoenix, Inc.),* 240 F.3d 823 (9th Cir.2001), the governing Ninth Circuit precedent on § 510(b), the claimants held shares in a corporation that had entered into a merger agreement with the debtor. Although the agreement called for the claimants to receive shares of stock from the surviving entity in exchange for their shares in the acquired corporation, the merger never closed and the shares remained in escrow. In concluding that the claims were properly subject to subordination under § 510(b), the court adopted a broad interpretation of what constitutes "a claim arising from the purchase or sale of a security." *See Betacom,* 240 F.3d at 828–31.

The Ninth Circuit in *Betacom* drew its analysis of § 510(b) from John J. Slain & Homer Kripke, *The Interface Between Securities Regulation and Bankruptcy—Allocating Risk of Illegal Security Issuance Between Security Holders and the Issuer's Creditors,* 48 N.Y.U.L.Rev. 261 (1973), the same law review article on which Congress heavily relied in crafting § 510(b). *See* H.R.Rep. No. 95–595, at 195 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5787, 6155 (explaining that the argument for mandatory subordination. is best described by Slain & Kripke in this article). The Ninth Circuit stated in *Betacom:*

According to Slain and Kripke, the dissimilar expectations of investors and creditors should be taken into account in setting a standard for mandatory subordination. Shareholders expect to take more risk than creditors in return for the right to participate in firm profits. The creditor only expects repayment of a fixed debt. It is unfair to shift all of the risk to the creditor class since the creditors extend credit on reliance on the cushion of investment provided by the shareholders.

*Betacom,* 240 F.3d at 829. The Ninth Circuit further described the two primary rationales for mandatory subordination of shareholder claims as, "the dissimilar risk and return expectations of shareholders and creditors; and . . . the reliance of creditors on the equity cushion provided by shareholder investment." *See id.* at 830.

The *Betacom* court held that the first rationale applied to the facts of that case, even without an "actual" sale or purchase of stock, because the investors entered into the agreement with greater financial expectations than a creditor would have. *Betacom,* 240 F.3d at 830. The court stated that it would be inequitable to allow the claimants to share in the potential benefit

of the proceeds of the corporation while shifting the risk of loss to the general creditors. *Id.*

The Ninth Circuit also found that the second rationale applied in *Betacom* because some of the Debtor's creditors had extended credit to the debtor after the merger at issue. The court presumed these creditors had extended credit in reliance, at least in part, on the equity cushion augmented by the additional assets resulting from the merger. *See id.* at 830–31.

## 2. Decisions from Other Courts

Decisions of other courts are in accord. On facts similar to those before us, the Delaware bankruptcy court recently held in *Alta + Cast* that a claim for breach of an employment contract was subject to subordination pursuant to § 510(b). The claimant's employment agreement in that case provided for both a cash salary and 15% equity in the debtor. The employment agreement further provided that, upon any termination of claimant's employment for cause, the debtor would repurchase his equity interest. After the claimant's termination, a jury concluded that the termination was for cause and that the debtor was obligated to repurchase the equity pursuant to the employment agreement. The debtor then asserted that the claim should be subordinated pursuant to § 510(b).[6] *See Alta + Cast,* 301 B.R. at 152–53.

The claimant in *Alta + Cast* asserted that there was no causal connection between his claim and the purchase of his ownership interest, but that the claim was instead for breach of the employment agreement. The court was not persuaded. It found that the breach was not the debtor's termination of the claimant, but the debtor's failure to repurchase his equity.

The court held that the claim clearly arose from the sale or purchase of a security and was appropriately subject to mandatory subordination. *See id.* at 155.

*Alta + Cast* illustrates two important points. First, it shows that a § 510(b) subordination can arise out of an employment contract if that contract provides for payment of the employee in stock. Second, it shows that, where the only unperformed portion of the contract is the stock transaction at issue, the claim arising therefrom is subject to § 510(b) subordination.

A second recent case similar to the case at bar is *Weissmann v. Pre–Press Graphics Co. (In re Pre–Press Graphics Co.),* 307 B.R. 65 (N.D.Ill.2004). Weissmann, a former shareholder/director of the corporation, had purchased his stock in the debtor some ten years earlier. Before the bankruptcy filing, Weissmann had obtained a state court judgment against the debtor (as well as other shareholders) for shareholder oppression and breach of fiduciary duty arising from the following conduct: diluting his shares through secret capital transactions, demanding his resignation as a director, and valuing his shares at $106.14 per share despite having received offers ranging from $2,000 to more than $9,000 per share. *See id.* at 69. The district court applied § 510(b) to subordinate Weissmann's claim.

Other courts interpreting § 510(b) have relied similarly on the Slain & Kripke risk analysis rationale, and have concluded that the statutory language requires subordination of a broader range of claims than just securities fraud claims. *See, e.g., Baroda Hill Invs. Inc. v. Telegroup, Inc. (In re Telegroup, Inc.),* 281 F.3d 133, 136–43 (3d Cir.2002) (subordinating shareholders' claims for breach of contract in failing to

---

**6.** The court also found that § 510(a) required

subordination of the claim. *See id.* at 153–54.

use best efforts to ensure that stock was registered and freely tradable); *In re NAL Fin. Group, Inc.*, 237 B.R. 225, 230–31 (Bankr.S.D.Fla.1999) (subordinating an investor's claim for damages resulting from an issuer's failure properly to register debentures because the registration failure was a causal link in the damage claim); *In re Granite Partners*, 208 B.R. 332, 336–37 (Bankr.S.D.N.Y.1997) (subordinating claim for fraudulently inducing creditors to retain and not sell collateralized mortgage obligations); *In re Public Serv. Co.*, 129 B.R. 3, 5 (Bankr.D.N.H. 1991) (subordinating indemnity claim of insurer of directors and officers who had been sued on securities and other claims).

### 3. *Mobile Tool*

In oral argument on this appeal, appellee urged the Panel to consider *Official Committee of Unsec. Creds. v. American Capital Fin. Servs., Inc. (In re Mobile Tool Int'l, Inc.)*, 306 B.R. 778 (Bankr. D.Del.2004), another decision issued by the same Delaware bankruptcy court that issued *Alta + Cast*. In *Mobile Tool*, the court found that the claims at issue did not arise from the purchase or sale of a security and thus were not subject to mandatory subordination under 510(b). Because we read *Mobile Tool* in conjunction with *Alta + Cast*, we do not think that *Mobile Tool* bolsters appellee's position.

The claimants in *Mobile Tool* were former officers who had purchased common stock in the debtor and had agreements with the debtor to repurchase their stock. Nearly a year before the bankruptcy filing, the claimants exchanged their stock for notes issued by the debtor. The bankruptcy court found that the claims in the bankruptcy case were based on the promissory notes, not on the sale or purchase of securities. The court opined that, while the purpose of § 510(b) was to prevent equity investors from converting their equity claims into those of general unsecured creditors, such reasoning did not apply to the claims in that case because they were based on the unpaid notes. *Id.*

The court in *Mobile Tool* distinguished *Alta + Cast* on the basis that, in *Alta + Cast*, no separate debt instrument had been issued. Because a separate debt instrument had been issued before the bankruptcy filing in *Mobile Tool*, the court held that the claimants had been converted from shareholders into creditors and the variable nature of their investment had disappeared. *Id.* at 781. Nothing equivalent occurred in the case at bar: the judgment was for the value of the stock to which appellee was entitled.

The facts here have much more in common with *Alta + Cast* than *Mobile Tool*. Here, Racusin never bargained for, and AWI and Leroy's never issued, any sort of separate debt instrument to him that would have converted him from shareholder into a creditor.

There is a more fundamental reason that we find *Mobile Tool* unpersuasive. *Mobile Tool* found decisive the fact that the claimants had sold their securities back to the debtors in exchange for promissory notes. This is precisely what occurred (in a settlement context) in *Archer v. Warner*, 538 U.S. 314, 123 S.Ct. 1462, 155 L.Ed.2d 454 (2003) (except that, in addition, in *Archer* all parties had granted general releases). Nonetheless, in *Archer* the Supreme Court held that the settlement agreement and releases did not bar the creditors from showing that the underlying debt was based on fraud and thus was nondischargeable. *See id.* at 323, 123 S.Ct. 1462. For this reason, we find *Mobile Tool* unpersuasive.

### D. Application of Slain & Kripke Analysis

Following the Slain and Kripke analysis, as *Betacom* requires us to do, we

must look at two factors: whether Racusin undertook the risks of a creditor or those of a shareholder in contracting to receive stock as part of his compensation, and whether other creditors relied on the equity cushion that the debtor enjoyed because Racusin's compensation was payable principally in stock rather than in cash.

### 1. Undertaking Risks of a Creditor

We first inquire whether Racusin undertook the risks of a creditor in contracting for his services in this case, or whether he chose to gamble on the value of the Leroy's (and ultimately AWI's) stock in the hopes of participating in the firm's profits and the rise in its stock value.

It is clear that Racusin did some of both. For a portion of his compensation, he contracted for the payment of a fixed sum of $150,000, which was unaffected by the market value of Roy's stock. Racusin has received the $150,000 cash portion of his claim and this is not at issue in this appeal.

At the same time, Racusin contracted to receive 4.5% of the IPO stock issue and to have this portion of his compensation determined by the value of this stock when he chose to sell it. As to this part of his compensation, Racusin thus chose to cast his lot with the shareholders and to share with them the expected increase in the value of the AWI stock. He contracted for greater financial expectations than creditors could have obtained. Indeed, $2,160,000 of the district court jury award is directly based on the jury's determination of how much Racusin would have realized in 1996 from the sale of the stock he was promised.

At the same time that Racusin contracted for shareholder financial expectations, he shouldered the risk that the stock would go down in value, and that he would receive little or nothing for this portion of his compensation. Thus Racusin had shareholder expectations for his compensa-

tion in stock, and clearly fits within the first *Betacom* rationale for subordinating his claim under § 510(b).

Indeed, for a while this looked like a good deal for Racusin. When he was hired, the best proposal that Leroy's had received for its IPO was $15 million. Ultimately, the IPO was priced at $45 million, and Racusin's contract gave him a right to receive 4.5% of this appreciated value. This is a shareholder benefit that none of the other creditors has enjoyed in this case. Indeed, creditors are not entitled to share in appreciation—this is a shareholder right, not a creditor right.

Racusin could have negotiated to receive the entire compensation package in cash, but instead chose to bargain for equity and, consequently, to assume the risks of an investor. One of the risks of an investor is § 510(b) subordination of damage claims.

### 2. Creditors' Reliance on Equity Cushion

The second rationale for § 510(b), as explained in *Betacom*, also applies in this case. As in *Betacom*, at least some creditors in this case extended credit to the debtors after the contract was made, presumptively in partial reliance on the equity cushion as augmented by Racusin's contribution. *Betacom*, 240 F.3d at 831.

Indeed, perhaps all of the creditors fall in this category. Racusin entered into his contract with Roy's on November 11, 1994, nearly nine years before the debtors filed these consolidated bankruptcy cases on July 25, 2003. During that time, Racusin's claim appeared on the debtor's balance sheets as equity, not as debt, inducing further reliance by later creditors on the equity cushion that his investment provided.

### E. Causal Nexus

■ Racusin also argues that his claim lacks the requisite causal nexus between

claim and a breach "arising from" the purchase or sale of a security that would mandate subordination. Racusin disputes that his damages "arise from" such a transaction. Racusin points to the fact that the contract giving rise to his claim predated these underlying bankruptcy cases by more than eight years.

We disagree. We find that the causal nexus here is clear: the non-delivery of stock was the sole cause of Racusin's damages, and his damages arise solely from this breach. This non-delivery occurred in 1996, less than two years after the date of contracting. The intervening time between 1996 and the bankruptcy filing in 2003 was entirely taken up with Racusin's litigation.

Racusin argues that the cause of his claim is Leroy's breach of the contract. However, the breach of contract here consisted in Leroy's failure to deliver securities constituting 4.5% of AWI's equity. Despite Racusin's attempt to characterize his claim as a claim for a breach of a compensation agreement, his claim most certainly does have a "transactional nexus" with a purchase or sale of stock. Had Racusin actually received the stock owed to him under the compensation agreement, he could not make the claim that he filed in these bankruptcy cases. *See In re PT-1 Communications, Inc.*, 304 B.R. 601, 608 (Bankr.E.D.N.Y.2004) (finding that, if claimants had received the stock to which they claimed entitlement, they would not have claims to make in the bankruptcy case).

■ Moreover, the causal nexus required for § 510(b) subordination is not strict. A claim "need not flow directly from the securities transaction, but can be viewed as 'arising from' the transaction if the transaction is part of the causal link leading to the injury." *Id.* at 608. We

find a clear causal nexus between Racusin's contract for payment in AWI equity and the claim that he filed in this case.

### F. Preference over Other Equity Holders

Racusin argues that § 510(b) is typically used to prevent an equity holder from obtaining treatment preferential to other equity holders. This argument misperceives the rationale for § 510(b). It is not the other equity holders whose interests § 510(b) protects. Indeed, if a debtor is insolvent, the interests of all equity holders are essentially valueless.

■ Section 510(b) has much more important work to do—to protect creditors from dilution of their claims by equity holders trying to claim creditor status. *See Baroda Hill Invs. Inc. v. Telegroup, Inc. (In re Telegroup, Inc.)*, 281 F.3d 133, 142 (3d Cir.2002); *In re PT-1 Communications, Inc.*, 304 B.R. 601, 609-10 (Bankr. E.D.N.Y.2004). The purpose of § 510(b) is to protect the rights of creditors, not the rights of other shareholders.

### V. CONCLUSION

Fundamentally, Racusin's deal with Leroy's was to perform services in exchange for stock (apart from the $150,000 cash payment). Through and through, this is a stock transaction. The only wrinkle is that Racusin paid for the stock in services rather than in cash. This claim for damages arises from a purchase of the stock by Racusin and a sale by Leroy's within the meaning of § 510(b). Accordingly, we conclude that Racusin's claim must be subordinated pursuant to § 510(b).

For the foregoing reasons we reverse the bankruptcy court and remand for proceedings consistent with this opinion.