FILED

JAN 19 2016

SUSAN M. SPRAUL, CLERK
U.S. BKCY. APP. PANEL
OF THE NINTH CIRCUIT

ORDERED PUBLISHED

**UNITED STATES BANKRUPTCY APPELLATE PANEL**

**OF THE NINTH CIRCUIT**

| | |
|---|---|
| In re: ) | BAP No.   EC-15-1091-JuFD |
| ) | |
| NANCY ADINOLFI, ) | Bk. No.   14-12645 |
| ) | |
| Debtor. ) | |
| _____ ) | |
| ) | |
| NANCY ADINOLFI, ) | |
| ) | |
| Appellant, ) | |
| ) | |
| v. ) | **OPINION** |
| ) | |
| MICHAEL MEYER, Chapter 13 ) | |
| Trustee, ) | |
| ) | |
| Appellee. ) | |
| _____ ) | |

Argued and Submitted on November 19, 2015
at Sacramento, California

Filed – January 19, 2016

Appeal from the United States Bankruptcy Court
for the Eastern District of California

Honorable Fredrick E. Clement, Bankruptcy Judge, Presiding

_____

Appearances:   David R. Jenkins argued for Appellant Nancy
                Adinolfi; Deanna K. Hazelton argued for Appellee
                Michael H. Meyer, chapter 13 trustee.

_____

Before:  FARIS, DUNN, and JURY, Bankruptcy Judges.


Opinion by Judge Faris.

Dissent by Judge Jury.

FARIS, Bankruptcy Judge:

## INTRODUCTION

Debtor Nancy Adinolfi appeals from the bankruptcy court's order denying the confirmation of her chapter 13[1] plan. A chapter 13 debtor whose income exceeds the applicable median must devote all of her "projected disposable income" to the payment of her unsecured creditors. The statute excludes "benefits received under the Social Security Act" from "disposable income." The Debtor argues that Adoption Assistance payments she receives are "benefits received under the Social Security Act," but the bankruptcy court ruled to the contrary. We hold that the bankruptcy court erred, and therefore we REVERSE.

## FACTUAL BACKGROUND

The parties stipulated to most of the facts. The Debtor receives $1,422[2] per month in Adoption Assistance payments under the Adoption Assistance and Child Welfare Act of 1980. That act established a program of federal payments to participating states to provide funds for financial assistance to families adopting special needs children from foster care. 42 U.S.C. §§ 670-76. Pursuant to this Act, California receives funds from the federal government under Title IV-E of the Social Security Act ("SSA").

---

[1] Unless otherwise indicated, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532, and "Rule" references are to the Federal Rules of Bankruptcy Procedure.

[2] The Debtor has entered into two Adoption Assistance Program Agreements. The Debtor receives $729 per month under one agreement and $693 under the other agreement.

Each year, the U.S. Department of Health and Human Services calculates the Federal Medical Assistance Percentage ("FMAP"). The FMAP is used to determine the amount of federal matching funds provided to various subsidy programs, including the Adoption Assistance program. The Adoption Assistance payments are then paid from a pool of federal funds allocated to California to pay individuals who qualify under the California Welfare and Institutions Code §§ 16115 through 16125. Specifically, the money allocated to fund the Debtor's Adoption Assistance payments, as well as all other individuals receiving the same benefits, were comprised of 50% federal funding, 37.5% state funding, and 12.5% county funding. The Debtor's payments under the Adoption Assistance program are paid directly by Merced County Human Services Agency, not the federal government.

The Debtor filed a chapter 13 petition. She disclosed the Adoption Assistance payments but took the position that those payments were not included in her disposable income.[3] She proposed a chapter 13 plan with a monthly payment of $935, which would have paid 0% to unsecured non-priority creditors.

Appellee Michael Meyers, chapter 13 trustee, objected to confirmation of the plan, contending that it was improper to exclude the Adoption Assistance payments from her income when

---

[3] The Debtor also excluded from her income $1,909 per month that she receives as Foster Care payments. Prior to the plan confirmation hearing, and in response to the Trustee's objection, she stipulated that the Foster Care payments should be included in her income because the Foster Care benefits are entirely state funded. At oral argument, her counsel said that this stipulation may have been a mistake, but the Foster Care payments are not before us.

3

calculating her plan payments.

The Bankruptcy Court sustained the objection of the Trustee, concluding that the Adoption Assistance payments should have been included in the Debtor's current monthly income. This timely appeal followed.

**JURISDICTION**

The bankruptcy court had jurisdiction pursuant to 28 U.S.C. §§ 1334 and 157(b)(2)(A). Denial of confirmation of a chapter 13 plan is an interlocutory order and therefore not ripe for appeal without leave. Bullard v. Blue Hills Bank, 135 S. Ct. 1686, 1695 (2015). On May 20, 2015, a motions panel granted leave to appeal. Therefore, we have jurisdiction under 28 U.S.C. § 158(a)(3).

**ISSUE**

Whether the bankruptcy court erred when it held that Adoption Assistance payments are not "benefits received under the Social Security Act" within the meaning of § 101(10A)(B).

**STANDARD OF REVIEW**

"We review the bankruptcy court's findings of fact for clear error; we review its conclusions of law **de novo**." Quintana v. Comm'r of Internal Revenue Serv. (In re Quintana), 915 F.2d 513, 515 (9th Cir. 1990) (citing Ragsdale v. Haller, 780 F.2d 794, 795 (9th Cir. 1986)).

We apply the de novo standard when reviewing chapter 13 plan confirmation issues requiring the interpretation of a statute. Moen v. Hull (In re Hull), 251 B.R. 726, 730 (9th Cir. BAP 2000) (citing United Cal. Sav. Bank v. Martin (In re Martin), 156 B.R. 47, 49 (9th Cir. BAP 1993)); see In re Quintana, 915 F.2d at 515

4

("The interpretation of a federal statute is a question of law reviewed de novo." (citation omitted)).

**DISCUSSION**

**A.   Adoption Assistance payments are "benefits received under the Social Security Act" and covered by the SSA exclusion.**

A bankruptcy court can confirm a chapter 13 plan only if the plan meets numerous requirements.  One of these is § 1325(b)(1), which provides that the court may not confirm a plan over the objection of the trustee (or an unsecured creditor) unless the plan provides for full payment of all unsecured claims or "the plan provides that all of the debtor's projected disposable income . . . will be applied to make payments to unsecured creditors under the plan."

This section contains a nested set of defined terms.  Under § 1325(b)(2), "the term 'disposable income' means current monthly income received by the debtor," subject to an exclusion which we discuss below, less certain expenses.  Section 101(10A)(B) defines "current monthly income."  Under that definition, a debtor's "current monthly income" "excludes benefits received under the Social Security Act."

This appeal requires us to construe that exclusion from current monthly income, which we will call the "SSA exclusion."

In doing so, we follow well-established rules of statutory construction.  We focus on the language of the statute.  Lamie v. U.S. Tr., 540 U.S. 526, 534 (2004); Friedman v. P+P, LLC (In re Friedman), 466 B.R. 471, 479 (9th Cir. BAP 2012).  We give each word its ordinary meaning unless the statute or the context requires otherwise.  United States v. Neal, 776 F.3d 645, 652

5

(9th Cir. 2015); Foxgord v. Hischemoeller, 820 F.2d 1030, 1032 (9th Cir. 1987).  We may refer to dictionary definitions.  United States v. Banks, 556 F.3d 967, 978 (9th Cir. 2009) (In interpreting statutory words, "dictionary definitions are cognizable.").  We must interpret not only the individual words, but also the provision as a whole along with related provisions.  United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd., 484 U.S. 365, 371 (1988) ("Statutory construction, however, is a holistic endeavor.  A provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme -- because the same terminology is used elsewhere in a context that makes its meaning clear, or because only one of the permissible meanings produces a substantive effect that is compatible with the rest of the law . . . ." (internal citations omitted)); United States v. 144,774 pounds of Blue King Crab, 410 F.3d 1131, 1134 (9th Cir. 2005) ("It is an accepted canon of statutory interpretation that we must interpret the statutory phrase as a whole, giving effect to each word and not interpreting the provision so as to make other provisions meaningless or superfluous.").

If the statutory language is ambiguous, we may consult additional guides to interpretation, such as legislative history and the statute's context.  Searcy v. Ada Cty. Prosecuting Attorney's Office (In re Searcy), 463 B.R. 888, 892 (9th Cir. BAP 2012), aff'd, 561 F. App'x 644 (9th Cir. 2014) ("where statutory language is ambiguous, courts need to look beyond the specific language of the subject statute to the context in which that language is used and to relevant legislative history").  A term

6

is ambiguous if it is fairly susceptible to different reasonable interpretations. Woods v. Carey, 722 F.3d 1177, 1181 (9th Cir. 2013) (stating that a statute is ambiguous if it gives rise to more than one reasonable interpretation); A-Z Int'l v. Philips, 179 F.3d 1187, 1192 (9th Cir. 1999) (same).

Courts have construed the SSA exclusion in different ways. Compare In re Munger, 370 B.R. 21, 23-26 (Bankr. D. Mass. 2007) (holding that unemployment compensation is excluded from current monthly income as defined because unemployment compensation is a benefit received under the Social Security Act), and In re Sorrell, 359 B.R. 167, 180-81 (Bankr. S.D. Ohio 2007) (holding that unemployment compensation is excluded from current monthly income and noting that § 101(10A) "does not speak of 'payments,' direct, indirect, or otherwise, but instead contains the unambiguously broader term 'benefits'"), with DeHart v. Baden (In re Baden), 396 B.R. 617, 621-23 (Bankr. M.D. Pa. 2008) (holding that unemployment compensation is not excluded from current monthly income because unemployment compensation is not a "benefit" - an ambiguous word - received under the Social Security Act, but received under a state-run program), and In re Kucharz, 418 B.R. 635, 640-43 (Bankr. C.D. Ill. 2009) (holding that unemployment compensation is not excluded from current monthly income, and noting that § 101(10A)(B) "is ambiguous on its face, as it is amenable to two conflicting interpretations"). We therefore conclude that the SSA exclusion is ambiguous.

Judicial decisions, even those that are not binding on this Panel, are an excellent source of interpretive guidance. There are no decisions addressing whether the SSA exclusion covers

7

Adoption Assistance payments. Several courts have considered a related issue: whether unemployment insurance payments are "benefits received under the Social Security Act." Most of those courts have held that unemployment compensation is not excluded. See, e.g., In re Gentry, 463 B.R. 526 (Bankr. D. Colo. 2011). A minority of courts have held that the exclusion applies. See, e.g., In re Munger, 370 B.R. at 23-26.

**1. Construction of the individual words**

We begin with the individual words in the phrase, and then turn to the phrase as a whole.

The word "benefits" does not present a problem in this case. No one denies that the Adoption Assistance payments which the Debtor receives are "benefits."

The word "received," at least in isolation, also presents no difficulty. There is no question that the Debtor "receives" the Adoption Assistance payments.

The word "under" has many meanings, but we can reject most of them because they do not make sense in this context. The meanings that make sense here are "subject to the authority, control, guidance, or instruction of," Merriam-Webster's Collegiate Dictionary 1283 (10th ed. 2002), or "in accordance with (some regulative power or principle)," Oxford English Dictionary, www.oed.org. Significantly for this case, the dictionary definitions do not support the proposition that "under" means that the subject is under the **exclusive** control of something.

The "Social Security Act" is codified at 42 U.S.C.A. §§ 301-

8

1397mm.[4]  The SSA was first enacted in 1935 and has been amended hundreds of times since then.  See generally Historical Background and Development of Social Security, https://www.ssa.gov/history/briefhistory3.html (last accessed Dec. 3, 2015).  It has become a sprawling statute, filling twelve volumes of the United States Code Annotated and providing for many benefit programs, some of which are familiar and others obscure.  These programs have a bewildering variety of funding formulae and administrative mechanisms.  The federal government funds and administers some of the programs itself, but most of the programs contemplate some degree of state involvement, and many are jointly funded and operated by the federal and state governments.  The following summary does not include all such programs and dramatically simplifies the program requirements for almost all of them.  Our purpose is to emphasize the wide variation in the programs authorized by the SSA and the futility of picking and choosing which programs are "under" the SSA.

### a.    Federally-administered programs

Some SSA programs are almost entirely operated and funded by the federal government.  But even these programs often contemplate some state involvement.  These include:

- The program that most people simply call "**Social Security**," which provides "old age," survivors, and disability insurance benefits.  42 U.S.C.A. §§ 401-434.  (Benefits are

---

[4]  For a list of the provisions of the Social Security Act, see the Table of Contents to the Compilation of the Social Security Laws, https://www.socialsecurity.gov/OP_Home/ssact/ssact-toc.htm (last accessed Dec. 3, 2015).

also available to the survivors of certain railroad retirees. Id. § 402(l). The federal government pays the entire cost of this program. Id. § 401(a). The states have little to do with its administration, with one important exception: a state may elect to have a state agency, rather than the federal government, make determinations of disability. If a state so elects, the federal government retains supervision of the state agency's performance and reimburses the state's administrative costs. Id. § 421. (A special provision applies if a state or political subdivision elects to allow its employees to participate in these benefits. Id. § 418.)

- **Medicare**, id. §§ 1395-1395kkk-1. Medicare is mostly operated by the federal government, through private companies acting as third-party administrators. Id. § 1395kk-1. The states may elect to be involved in Medicare by certifying the qualifications of certain health care providers. Id. § 1395aa.

- Supplemental security income ("**SSI**") for the low-income aged, blind, and disabled. Id. §§ 1381-1383f. This program contemplates some coordination with the states; if a state offers similar benefits, the state and the federal government may agree that the federal government will pay the state benefits on behalf of the state, and the state will reimburse the federal government for the state benefits paid plus a per-payment administrative fee. Id. § 1382e.

- Special benefits for **World War II veterans**, id. §§ 1001-1013. The SSA provides that, if a state provides comparable

10

benefits, the federal government may agree with the state to pay those benefits on behalf of the state, and the state reimburses the federal government for the benefits paid plus an administrative fee.  Id. § 1010a.

### b.    Federal funding of state-paid benefits

For other programs, the SSA provides that, if a state creates a program of a certain kind that meets detailed requirements (and is usually subject to federal approval of the state government's plan), the federal government will pay all or part of the benefits and the administrative costs of the program. These include:

- **Medicaid,** pursuant to which the federal government makes grants to states operating plans for medical assistance that meet the detailed and voluminous requirements of § 1396a. The federal government pays a percentage of the benefits paid by the states.  The percentage depends on a comparison of the state's per capita income with the national per capita income, but is not less than 50% or more than 83%. Id. § 1396d(b).  The federal government also pays a portion (usually 75%) of the state's expenses for administering various parts of the program.  Id. § 1396b.

- Programs in **Guam, Puerto Rico, and the Virgin Islands providing old age benefits**, id. §§ 301-306, where the federal government pays the territorial government half of the benefits payments, not to exceed a capped amount per beneficiary, and half of the administrative costs, id. § 303.

- The **Stephanie Tubbs Jones Child Welfare Services Program**,

11

id. §§ 620-628, under which the federal government reimburses states for 75% of the benefits paid and administrative costs for certain child welfare programs, subject to an aggregate cap. The same program authorizes matching grants to states and Indian tribes that provide "family connection programs." Id. § 627.

- Programs for **family support, family preservation, family reunification, and adoption support services**, id. §§ 629-629i. The federal government pays the states up to 75% of the cost of such programs plus certain grants for program administration and other purposes. Id. §§ 629d, 629g.

- **Foster care and adoption assistance**, id. §§ 670-679c. The federal government pays the "federal medical assistance percentage" of the covered benefit payments, 75% of parent training expenses, and 50% of operating expenses, id. § 674, plus possible incentive payments, id. § 673b. This program includes the Adoption Assistance payments at issue in this appeal.

- **Aid to the blind** in Puerto Rico, Guam, and the Virgin Islands, id. §§ 1201-1206. The federal government pays up to half of the benefits, subject to a dollar cap per beneficiary, and half of the territorial government's administrative expenses. Id. § 1203.

   **c. Federal reimbursement for administrative costs**

In a third category of programs, the SSA provides that, if a state creates a benefit program of a particular type that meets specified requirements, the federal government will reimburse the state for some or all of the reasonable costs of administering

12

the program, but not any benefit payments.  These include:

- **Unemployment compensation**, id. §§ 501-504, 1101-1110. Although the states fund these benefits, the federal government plays a crucial fiscal role.  In order to receive federal reimbursement for the state's administrative costs, the state must pay over to the federal government all taxes and other contributions to the state's programs.  The federal government holds the funds in the Unemployment Trust Fund and returns the funds to the states upon requisition. The federal government has the authority to make loans to states if the state needs money to pay benefits.  Id. §§ 1321-1324.  The federal government also funds part of the benefits in certain circumstances: if the federal government legislates to extend the usual 26-week benefit period, the federal government pays 50% of the extended benefits.  See In re Kucharz, 418 B.R. 635 (Bankr. C.D. Ill. 2009).

- Programs for **child support collection** and the **determination of paternity**, 42 U.S.C.A. §§ 651-669b.  The federal government reimburses up to 66% of the cost of operating qualified programs, id. § 655, plus certain incentive payments, id. § 658a.

### d.  Federal block grants and loans

In a fourth category, the SSA provides that the federal government provides "block grants" (and in some cases loans) to states (and Indian tribes) that enact and administer programs meeting specified criteria.  The amount of the grant is sometimes entirely independent of the state's outlays but in other cases is based on a formula that is tied (more or less loosely) to such

13

costs.  These include (among others):

- Temporary Assistance to Needy Families ("**TANF**"), id. §§ 601-619.  The TANF block grants are based on a lengthy and complicated set of criteria applied by the Secretary of the Treasury that depend only in part on the benefits actually paid by each state.  Id. § 603.  The states have latitude in spending the block grant money, id. § 604, but the SSA imposes certain strict limitations on the states' payments of benefits, e.g., id. §§ 607, 608.

- **Maternal and child health services**, id. §§ 701-713.  A fixed amount of money is allocated based on a formula that is not directly related to the states' expenses of such programs.  Id. §702(c).

- **Child care services, protective services for children and adults, foster care services, adult day care services**, and other programs generally described in 42 U.S.C.A. § 1397a.  A fixed aggregate sum is allocated among the states based on population, id. § 1397b, and the presence of "qualified empowerment zones" in the state, id. § 1397f.

- **Elder justice programs**, id. §§ 1397j-1397m-5.  Entities eligible to receive these grants include states and their political subdivisions as well as Indian tribes and other public and private entities.  Id. § 1397j(7).  The Department of Health and Human Services allocates a fixed sum among grant applicants on a more or less discretionary basis.

- State Children's Health Program, commonly known as "**SCHIP**," id. §§ 1397aa-mm.  This program provides funds to states

14

that maintain qualified and approved programs to provide health insurance to targeted low-income children under Medicaid or otherwise.  A fixed sum is allocated among qualified states based on a complicated formula that, very broadly summarized, covers half of the state's deemed cost of the program.  Id. § 1397dd.

- **The Ticket to Work and Self-Sufficiency Program**, id. § 1320b-19, under which the federal government provides a voucher to qualified disabled beneficiaries which the beneficiary may use to obtain services from "employment networks."  States may elect to establish employment networks and receive payments under the program.  The employment network receives payments for each month during which the beneficiary is not receiving specified welfare benefits (presumably because the beneficiary is employed) or is making progress toward employment.  Id. § 1320b-19(h); see also id. § 1320b-21 (describing another similar program).

In short, the "Social Security Act" encompasses a wide spectrum of programs.  Most of the programs involve some degree of state participation, and the extent of the states' involvement varies widely from program to program.

**2.    Construction of the entire phrase**

Having considered the individual terms contained in the phrase "benefits received under the Social Security Act," one must return to the entire phrase.  The most natural reading of this phrase is "benefits received subject to the authority of, and in accordance with, 42 U.S.C.A. §§ 301-1397mm."  The Adoption

15

Assistance payments received by the Debtor are paid out by the county government, but are subject to the federal program requirements and standards of 42 U.S.C.A. §§ 670-679c and federal oversight.  Thus, under our reading of the phrase, the Adoption Assistance payments which the Debtor receives are "benefits received under the Social Security Act" and are excluded from her "current monthly income."

**B.    The Trustee's arguments are unavailing.**

The Trustee mounts several arguments for a construction of the SSA exclusion that would not cover the Adoption Assistance payments (i.e., those payments should be included in current monthly income).

All of these arguments boil down to the proposition that, when Congress referred to "benefits received under the Social Security Act," it really meant only benefits received under **some** of the SSA programs.  However, when Congress referred to the "Social Security Act" as a whole, Congress knew of the many differences between and nuances in the individual SSA programs. Nothing in the language of the SSA exclusion suggests that Congress intended to include only those programs that are funded and administered solely by the federal government.  Accepting the Trustee's arguments would create arbitrary distinctions not clearly intended by Congress and would amount to an impermissible rewriting of the statute.

Therefore, and for the reasons explained below, we do not find any of the Trustee's arguments persuasive in this instance.

**1.    BAPCPA's purpose**

The Trustee argues that a narrow interpretation of the SSA

16

exclusion is more consistent with the purpose of the statute. The SSA exclusion was part of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"). The Trustee quotes legislative history suggesting that the "means test," which begins with a determination of the Debtor's "current monthly income," was enacted to "help[ ] courts determine who can and who cannot repay their debts and, perhaps most importantly, how much they can afford to repay." 151 Cong. Rec. S1726-01, S1786 (daily ed. Feb. 28, 2005).

The quoted legislative history does not help the Trustee. If Congress intended to require **all** debtors to pay more, a narrow interpretation of the SSA exclusion would make sense. But the legislative history shows that the purpose was more precise: to help courts separate "can-pay" debtors from "can't-pay" debtors, and to require "can-pay" debtors to pay as much as they can afford. The text of § 101(10A)(B) demonstrates that Congress decided that "benefits received under the Social Security Act" should not count when identifying "can-pay" debtors and deciding how much more they should pay. This is reasonable because generally the SSA programs are intended to benefit people who are needy in some respect: they are aged, sick, physically or mentally disabled, suffering from family separation or abuse, or the like. Thus, Congress could reasonably have decided that SSA beneficiaries are not generally "can-pay" debtors and that SSA benefits should not count toward the debtor's ability to repay creditors. Neither the statutory text nor the legislative history suggests that Congress wanted the courts to give a narrower meaning to the SSA exclusion than a natural reading of

17

its words would support.

The purpose of the SSA also supports the natural reading of the SSA exclusion. Congress created the SSA programs to help people who have specified kinds of needs. For example, Congress created the Adoption Assistance program to help people meet the costs of adopting special-needs children out of foster care. Although Congress did not restrict the use of the Adoption Assistance funds in the hands of the adoptive parents, it is reasonable to suppose that Congress wanted the parents to use the funds to raise their adoptive children, not to repay their unsecured creditors under a chapter 13 plan. Thus, excluding the Adoption Assistance payments from current monthly income is consistent with the purpose of the SSA.

Some of the cases holding that unemployment insurance payments are not excluded rely on the purposes of BAPCPA. They note that, under pre-BAPCPA law, most courts included unemployment compensation in a debtor's income when determining the adequacy of chapter 13 plan payments. They assert that "a court should not assume that Congress intended to deviate from established applications of judicial interpretation unless the statute effects such a change with specificity." In re Gentry, 463 B.R. at 530. They conclude that the SSA exclusion should not cover unemployment compensation because pre-BAPCPA decisions included it in the debtor's disposable income. The issue of unemployment benefits is not before us, but we see two flaws in the application of this reasoning to the Adoption Assistance payments.

First, the canon does not apply by its terms. The "current

18

monthly income" construct, including the SSA exclusion, did not exist prior to BAPCPA.  Therefore, there are no pre-BAPCPA judicial interpretations of the relevant language.

Second, the best source of information about Congress' purpose is the words of the statutes it enacts.  See Church of Scientology of Cal. v. U.S. Dep't of Justice, 612 F.2d 417, 421 (9th Cir. 1979) ("in the vast majority of its legislation Congress does mean what it says and thus the statutory language is normally the best evidence of congressional intent").  It is true that BAPCPA generally made bankruptcy more difficult and expensive for many debtors, but it does not follow that courts must interpret every one of BAPCPA's provisions in that manner, especially where the most natural reading of a particular provision is not consistent with that perceived purpose.

### 2.   Remedial legislation

The Trustee argues that the "means test" is remedial legislation which must be broadly interpreted in order to effectuate its purpose.  This argument rests on a familiar interpretive canon which is often stated but is open to criticism.[5]

The canon does not help us because we face a clash between

---

[5]      The first problem with the remedial-statute rule is the difficulty of determining what constitutes a remedial statute.  Is any statute **not** remedial?  Does any statute **not** seek to remedy an unjust or inconvenient situation? . . .   The other problem with the remedial-statute rule is that identifying what a "liberal construction" consists of is impossible . . . .   The canon is therefore today either incomprehensible or superfluous.

Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 364-66 (2012) (emphases in original).

19

two pieces of "remedial" legislation. The first is BAPCPA, which was meant to remedy the perceived problem of "can-pay" debtors paying too little in bankruptcy. The Trustee argues that the remedial legislation canon should be used to create a broad definition of "current monthly income," and therefore a narrow definition of "benefits received under the Social Security Act." Some courts have accepted this argument in the unemployment insurance context. In re Gentry, 463 B.R. at 530-31. But the SSA is also remedial legislation; Congress meant to remedy the problems faced by people who are indigent, elderly, disabled, abused, etc. Cruz v. Sullivan, 912 F.2d 8, 11 (2d Cir. 1990) ("The [Social Security] Act must be liberally applied, for it is a remedial statute intended to include not exclude."). Thus, the remedial legislation canon supports a broad interpretation of the SSA exclusion.

In other words, applying the remedial legislation canon requires us to interpret the SSA exclusion both narrowly and broadly. It leads us nowhere.

### 3. The "follow-the-money" theory

The Trustee argues that the Debtor does not receive any benefits under the SSA because the Debtor does not receive any funds from the Social Security Administration. Instead, she receives checks from the county government. According to the Trustee, the state, not the Debtor, is the party receiving benefits under the SSA, because it is the state, not the Debtor, that receives direct federal funding. The Trustee argues that, "since the **states receive** the benefit, it is not income that the **debtor receives under the Social Security Act**, but income the

20

**debtor receives from a state** that chooses to set up social service programs." (Emphases in original.)

We are not persuaded by the Trustee's "follow the money" argument. If Congress meant what the Trustee says, Congress would have said something like "benefits received **from the federal government** under the Social Security Act." But that is not what Congress said. Rather, Congress used broad language which excludes all "benefits received under the Social Security Act." Congress knew that, under many SSA programs, state and local governments cut the benefit checks. Congress also knew how to refer to specific portions of the SSA when it wanted to do so. See, e.g., §§ 362(b)(2)(D), (E), (F), (G); 704(c)(1)(A)(i); 1302(d)(1)(A)(i). But in this case, Congress referred to the entire SSA. We must assume that, when Congress referred broadly to the SSA, Congress meant exactly what it said. In re Sorrell, 359 B.R. at 183.

The "follow the money" argument also produces an irrational result. As we note above, the "current monthly income" construct, of which the SSA exclusion is a part, is meant to help courts distinguish "can-pay" and "can't-pay" debtors and decide how much "can-pay" debtors can pay. The fact that a debtor receives a check from a state or local government, rather than the federal government, has no effect on the debtor's ability to pay. There is no reason to think that Congress intended to require beneficiaries of SSA programs who receive checks from state or local governments to pay more than beneficiaries of SSA programs who receive checks from the federal government.

The "follow the money" argument also proves too much. The

21

federal government sometimes hires private contractors to administer federal programs. Medicare is a prominent example; most Medicare benefits are paid by private companies acting as third-party administrators for the federal government. See 42 U.S.C.A. § 1395kk-1. But no one could plausibly deny that Medicare is "under the Social Security Act," even though private contractors cut the benefit checks.

### 4. *Expressio unius est exclusio alterius*

The Trustee correctly points out that, when a statute provides for enumerated exceptions, a court cannot create additional exclusions. The principle is of course correct, but it does not apply. The question is not whether the Panel should create a nonstatutory exception to "current monthly income," but rather how the Panel should interpret the existing statutory exclusion for SSA benefits. The *expressio unius* doctrine has nothing to do with the question we must answer.

In support of this argument, the Trustee cites <u>Blausey v. U.S. Trustee</u>, 552 F.3d 1124 (9th Cir. 2009). But that decision is not applicable. In that case, the debtor argued that private disability insurance benefits were not "income" for purposes of determining "current monthly income" because they are not taxable under the Internal Revenue Code. The Ninth Circuit rejected this argument for multiple reasons. First, the court pointed out that, under the statutory definition, "current monthly income" includes all income "without regard to whether such income is taxable income." This language makes clear that the Internal Revenue Code's definition of "income" does not apply under the Bankruptcy Code. The court went on to say that the Bankruptcy

22

Code's definition "specifically excludes certain payments, such as Social Security payments," but did not specifically exclude private disability insurance payments, so under familiar rules, the latter payments are included. In this case, there is a specific exclusion for SSA benefits; the only question is how to interpret that exclusion. The *expressio unius* canon does not apply.

### 5. The effect of state law

The Trustee points out that California has enacted its own law that provides for adoption assistance payments and permits California to receive reimbursement under the SSA. The Trustee argues that, therefore, the "benefits [are] received under" the California law, not under the SSA.

The unstated assumption that underlies this argument is that, to be excluded, the benefits must be received **only** under the SSA, and not also under state law. If this is what Congress meant, Congress could and would have included the word "only" in the relevant phrase.

The argument also does not account for the extensive federal regulation and supervision of the state's program. In order to receive federal payments, the state must (among other things) create a plan meeting extensive and detailed requirements, secure federal approval of that plan, provide periodic reports to the federal government, and submit to periodic audits. See, e.g., 42 U.S.C. § 671. The extensive and intrusive role of the federal government in the Adoption Assistance program means that the Adoption Assistance benefits are "received under" the SSA, even if they are also "received under" state law.

23

Nothing in the words of the statute suggests that the SSA must be the exclusive source of authority for the benefits program. The fact that Congress referred to the entire SSA, knowing that most SSA programs have some degree of state involvement, suggests the opposite.

**6.  The effect of § 1325(b)(2)**

The Trustee points out that, in a chapter 13 case, "'disposable income' means current monthly income received by the debtor (other than child support payments, foster care payments, or disability payments for a dependent child made in accordance with applicable nonbankruptcy law to the extent reasonably necessary to be expended for such child) . . . ." The Trustee argues that we must avoid a construction of § 101(10A)(B) that would render any part of § 1325(b)(2) redundant. Therefore, according to the Trustee, we must interpret "benefits received under the Social Security Act" in a way that excludes all "foster care payments." We disagree.

First, in chapter 13 cases, any overlap between the SSA exclusion and § 1325(b)(2) is only partial, and, in fact, the exclusions appear complementary. "Child support payments, foster care payments, or disability payments for a dependent child" could come from a program operated by a state or local government independent of the SSA, and might include payments from nongovernmental bodies, such as charities or private individuals. Therefore, our interpretation of the SSA exclusion does not render § 1325(b)(2) superfluous. See generally Schwartz v. United States (In re Schwartz), 954 F.2d 569, 574 (9th Cir. 1992) ("Although there are circumstances where section 362 overlaps

24

section 549 and renders it unnecessary, this overlap falls far short of rendering section 549 meaningless."); see also Carson Harbor Vill., Ltd. v. Unocal Corp., 270 F.3d 863, 884 (9th Cir. 2001) (The court acknowledged that, "despite their overlap[,]" the term "disposal" did not render the term "placement" superfluous.).

Second, the definition of "current monthly income" in § 101(10A)(B) applies to chapter 7 cases as well as chapter 13 cases. Section 707(b) provides (in brief summary) that the bankruptcy court can dismiss a chapter 7 case as abusive if the debtor's income exceeds the applicable median income and the debtor's "current monthly income" (reduced by certain expenses) exceeds a threshold. Chapter 7 does not contain the SSA exclusion adopted in § 1325(b)(2). Therefore, even if there were some overlap between §§ 101(10A)(B) and 1325(b)(2), it would be incorrect to narrow § 101(10A)(B).

**CONCLUSION**

For the reasons set forth above, we hold that the Adoption Assistance benefits the Debtor receives are covered by the SSA exclusion. We REVERSE the bankruptcy court's order and REMAND for further proceedings consistent with this opinion.

Dissent begins on next page.

25

Jury, Bankruptcy Judge, Dissenting:

To answer the narrow question presented to the Panel in this appeal, the majority, applying its version of statutory construction, has swept a broad, inclusive brush across the landscape of exclusions from current monthly income for the purposes of a chapter 13 means test analysis.  As highlighted by the majority's recitation of the myriad of benefit programs "provided by" the Social Security Act (SSA) - a "sprawling statute . . . providing for many benefit programs, some of which are familiar and others obscure" - this approach would exclude from the monies which must be committed to pay chapter 13 creditors any funds remotely connected to the SSA and the federal government - so remotely connected that it would exclude from disposable income payments to a debtor even though not one dollar came from the federal government and most people would have no idea the SSA had any connection to the payments received.

I submit that this outcome was not what Congress intended, based on statutory construction, the purposes of the means test, and common sense.

Section 101(10A)(B) defines current monthly income in pertinent part as:

> ... any amount paid by any entity other than the debtor (or in a joint case the debtor and the debtor's spouse), on a regular basis for the household expenses of the debtor or the debtor's dependents (and in a joint case the debtor's spouse if not otherwise a dependent), but **excludes benefits received under the Social Security Act** ....

11 U.S.C. § 101(10A)(B) (emphasis added).  As noted by the majority, the Panel's task is to determine whether Adoption

-1-

Assistance payments are included in the phrase "benefits received under the Social Security Act." At least two interpretations of § 101(10A)(B) have developed since the provision was added to the Bankruptcy Code as part of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"). The majority has joined the trustee (and rejected the Debtor's argument) in concluding that the phrase is ambiguous, with which I agree, so I need not recite the varying interpretations of the words in order to establish that point. However, I am not alone in construing this ambiguity narrowly; other courts have reached similar conclusions.

Adoption Assistance payments are only excluded from current monthly income if they are properly characterized as benefits received under the Social Security Act. § 101(10A)(B). To be "benefits received under," the benefits must more than "merely 'relate to' or be 'envisioned by' or 'induced by' the Social Security Act[,]" they must be **received under** the SSA. In re Kucharz, 418 B.R. 635, 641 (Bankr. C.D. Ill. 2009).

Multiple words in the phrase are ambiguous. Most discussed in the cases and by the parties is the term "under." Webster's Third New International Dictionary defines "under," in the context as used in § 101(10A)(B), as "required by" or "in accordance with." Webster's Third New International Dictionary 1143 (1993). Considering only this definition of "under", a benefit "received under" the Social Security Act may refer to a direct benefit made by the federal government or it may refer to an indirect benefit made by a state-run program.

Focusing the statutory construction analysis just on the term "under", however, presents an incomplete view. The word "under" directly follows the word "received" and in my view the words must be read together. Simply defined, "received" means "to come into possession of." Id. at 608. Therefore, read together, "received under" means "to come into possession of as required by or in accordance with" the SSA. This definition certainly suggests that unless the Social Security Administration is directly involved with the payment of money to the Debtor and the determination of who is entitled to the funds, the benefits are not "received under" the SSA. The majority, in its statutory construction analysis, only considers each word in isolation, tossing off the word "received"[1] without connecting it at all to "under the Social Security Act." As seen in my analysis below, I consider this isolation view as error because it ignores the source of the funds and how the Debtor may qualify for them.

Everyone agreeing that the statute is ambiguous, and that the words collectively or in isolation can have differing meanings, I now turn, as I must, to the statute's context within the overall statutory framework. When a statute is ambiguous, the Court may ascertain the legislative intent by analyzing the statute's legislative history while construing the statute in accordance with logic as well as public policy. Leavitt v. Alexander (In re Alexander), 472 B.R. 815, 822 (9th Cir. BAP 2012).

---

[1] "The word 'received,' at least in isolation, also presents no difficulty. There is no question that the Debtor 'receives' the Adoption Assistance payments." Majority Opinion at 8.

The legislative history of BAPCPA does not provide much assistance in determining Congress's intent, as the "information on the final version is sparse" and "inconclusive." In re Baden, 396 B.R. 617, 622 (Bankr. M.D. Pa. 2008); In re Kucharz, 418 B.R. at 640; see generally H.R. 250, 105th Cong. (1997).[2] However, it established that Congress had two primary concerns when enacting BAPCPA. The first is ensuring that the individuals who have the ability to pay their debts in fact do pay. See Tousey v. Neary (In re Ross-Tousey), 549 F.3d 1148, 1151 (7th Cir. 2008); see also In re Baden, 369 B.R. at 622. The second was to "protect[] education and retirement savings from being drained by creditors." In re Baden, 396 B.R. at 622 (citing H.R.Rep No. 109-31(I), at 2-3, 115 (2005), U.S. Code Cong. & Admin. News 2005, pp. 88-89, 177-78; 151 Cong. Rec. S2470 (Mar. 10, 2005); 151 Cong. Rec. S1726 (Feb. 28, 2005)).

Excluding Adoption Assistance payments from current monthly income is not consistent with these goals. As stated, § 101(10A)(A) defines current monthly income as "the average monthly income from all sources that the debtor receives without regard to whether such income is taxable income." Then, § 101(10A)(B) specifically excludes three types of payments from current monthly income: benefits received under the Social Security Act, payments to victims of war crimes or crimes against humanity on account of their status, and payments to victims of international terrorism. That Congress specifically excluded only these three specific sources of income signals an intent to

___

[2] There is no direct reference to the Social Security exclusion at all in the legislative history.

-4-

keep the exclusions narrow. Construing the exceptions in the broadest terms is inconsistent with the purpose of ensuring that the individuals who have the ability to pay their debts in fact do pay. The majority's interpretation of § 101(10A) creates an exception that swallows the rule; it opens the door for exclusions where a federal grant given to a state, no matter how small a percentage of what a debtor receives, would cause an entire category of income to be excluded.

Excluding Adoption Assistance payments also does not meet the second stated purpose - protecting **retirement** savings from being drained by creditors. Most of us think of Social Security payments as retirement income - i.e., what a retired person will need for basic living expenses. Adoption Assistance payments hardly fit that use and it cannot be argued they meet that stated purpose. The logical conclusion to draw from the legislative history is that Congress wanted to protect Social Security retirement benefits (theoretically, paid in by debtors from their lifetime earning careers) from the means test but otherwise sought to maximize the types of income to be used to pay creditors.

Although no reported cases address whether Adoption Assistance payments are a benefit under the SSA, there have been a handful of cases that have addressed whether unemployment compensation is one of the benefits received under the Act. I recognize a split in authority on the issue. On one hand, In re Sorrell, 359 B.R. 167 (Bankr. S.D. Ohio 2007), and In re Munger, 370 B.R. 21 (Bankr. D. Mass. 2007), have held that unemployment compensation is one of the benefits received under the SSA.

-5-

These courts reason that although unemployment compensation is administered through a number of different state-run programs, the common funding source of all unemployment compensation is the SSA. They take the position that § 101(10A)(B) does not make a distinction between direct and indirect benefits. See In re Sorrell, 359 B.R. at 181; In re Munger, 370 B.R. at 23.

On the other hand, In re Baden and In re Kucharz have held that unemployment compensation is not one of the benefits received under the SSA. In so holding, both courts take the position that unemployment compensation is governed by state law and administered pursuant to state-run agencies. They thus conclude that unemployment compensation is not paid under the SSA; rather, it is merely an indirect benefit. See In re Kucharz, 418 B.R. at 643; In re Baden, 396 B.R. at 623. As such, courts on either side of the split ultimately base their respective positions on the source of the funds.

Although these cases are distinguishable since they address a different governmental benefit, i.e., unemployment compensation vs. Adoption Assistance payments, the reasoning used by the courts is a helpful consideration in my determination that Adoption Assistance payments are not excluded from current monthly income.

I find the reasoning in In re Kucharz persuasive. After giving an in depth analysis of the origins of the SSA and unemployment compensation, the Kucharz court concluded that "unemployment insurance claims are submitted to, evaluated and paid or denied by state officials implementing state law," and administered by a state agency that was specially created to

handle unemployment compensation, independent of the SSA. Id. at 639. The unemployment compensation benefits are therefore not received under the SSA. This reasoning is compelling, and the source of funds for the benefits is strikingly similar to the case at hand. As will be further explained below, the Adoption Assistance payments are paid to the Debtor as required by state law, not by the SSA; thus, like unemployment compensation, the Debtor does not receive Adoption Assistance payments under the Act.

As the majority highlights, the Social Security Act, 42 U.S.C. §§ 402-34, speaks of various programs. Whereas some payments made as part of the benefit programs come directly to the recipient from the Social Security Administration, for some of the programs, the Social Security Administration contributes funds to state-run programs which combine those funds with monies from other sources to provide benefits to the recipients. The Ninth Circuit in Drummond v Welsh (In re Welsh), 711 F.3d 1120 (9th Cir. 2013), held that payments made by the Social Security Administration are excluded from the computation of current monthly income, arguably because they are solely sourced in Social Security funds and paid by that agency directly to the recipient. Adoption Assistance payments are not such payments, as money is paid to the adoptive parents by the state-run programs. The State of California, like all other States that participate, accepts funds from the federal government under Title IV-E of the Social Security Act, but fifty percent of the funding also comes from state and local sources. California has created a separate statutory scheme to comply with the federal requirements. As

-7-

such, the administrative agency which the State has designated to administer the Adoption Assistance program is the California Department of Social Services. See Cal. Wel. & Inst. Code § 16121. In order to receive funding, each adoptive parent must enter into a written agreement with the State of California. 42 U.S.C. §§ 673(a)(1) & 675(3). The federal government is not a party to these contracts.

The simple fact is that Adoption Assistance payments are paid to the Debtor as required by state law, not by the SSA, nor are they paid by the Social Security Administration. Furthermore, the qualifications to receive such funds are determined by state statutes and regulations, and the State of California manages and staffs the program. As such, although the SSA may be a source of funds which make up part of the payment, the Adoption Assistance payments are **received** from the State of California and its corresponding state agency. Therefore, I conclude that Debtor does not *receive* the Adoption Assistance payment under the SSA, but under the California Welfare and Institutions Code.

Concluding that Congress could not have intended the broad exclusions from chapter 13 disposable income that the majority proclaims, I respectfully dissent.

-8-