**ORDERED PUBLISHED**

# UNITED STATES BANKRUPTCY APPELLATE PANEL
## OF THE NINTH CIRCUIT

| | |
|---|---|
| In re:<br>MATHESON FLIGHT EXTENDERS, INC.; MATHESON POSTAL SERVICES, INC.; MATHESON TRUCKING, INC.,<br>　　　　　Debtors. | BAP No. EC-25-1142-LSB<br><br>Bk. No. 22-21148 |
| MAHAMET CAMARA; ANDRE DE OLIVERA; BEMBA DIALLO; SALIF DIALLO; MACIRE DIARRA; ARDITH DUKE, as Personal Representative of the Estate of Ernie Duke; DEAN PATRICELLI,<br>　　　　　Appellants,<br><br>v.<br><br>MATHESON FLIGHT EXTENDERS, INC.; MATHESON POSTAL SERVICES, INC.; MATHESON TRUCKING, INC.,<br>　　　　　Appellees. | **OPINION** |

Appeal from the United States Bankruptcy Court
for the Eastern District of California
Christopher M. Klein, Bankruptcy Judge, Presiding

APPEARANCES
Amy N. Tirre of the Law Offices of Amy N. Tirre, APC argued for
appellants; Kevin W. Coleman of Nuti Hart LLP argued for appellees.

Before: LAFFERTY, SPRAKER, and BRAND, Bankruptcy Judges.

1

Opinion by Judge Lafferty
Concurrence by Judge Spraker

LAFFERTY, Bankruptcy Judge:

## INTRODUCTION

Creditors Mahamet Camara, Andre de Olivera, Bemba Diallo, Salif Diallo, Macire Diarra, Ardith Duke, and Dean Patricelli (the "Camara Creditors") appeal the bankruptcy court's order subordinating and partially disallowing their claim against debtors Matheson Flight Extenders, Inc. ("MFE"), Matheson Trucking, Inc. ("MTI"), and Matheson Postal Services, Inc. (collectively, "Debtors").

A federal jury awarded the Camara Creditors well over $14 million in their discrimination lawsuit against MFE, and the Camara Creditors moved for additional damages flowing from that judgment, such as attorneys' fees and interest. MFE promptly filed for chapter 11[1] protection.

In connection with MFE's case, the parties reached a compromise to settle the debt owed to the Camara Creditors. This settlement was eventually incorporated into a chapter 11 plan and, for years, MFE and MTI made payments pursuant to the compromise.

Almost a decade later, Debtors defaulted under the settlement agreement and filed their current chapter 11 petitions. Debtors proposed a

---

[1] Unless specified otherwise, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101–1532.

joint plan of liquidation that treated the Camara Creditors' claim as a general unsecured claim, and the bankruptcy court confirmed that plan.

Post-confirmation, Debtors moved to subordinate the Camara Creditors' claim on the basis that the claim arose from an award of punitive damages, and also moved for partial disallowance of their claim on the basis that a portion of the claim was an unenforceable penalty.

The bankruptcy court agreed with Debtors. The court subordinated the Camara Creditors' claim under § 1129(a)(7) and disallowed $2.7 million of the claim as a penalty because that portion of the claim was disproportionate to actual damages sustained by the Camara Creditors.

We disagree that the Code allows for application of § 1129(a) outside the context of confirmation of a plan, such as for post-confirmation subordination of a claim. We further disagree that Nevada law would deem $2.7 million of the claim an unenforceable penalty.

Accordingly, we REVERSE and REMAND this matter for further proceedings consistent with this decision.

FACTS[2]

**A.    The federal discrimination lawsuit and the 2015 bankruptcy case**

Over a decade ago, the Camara Creditors sued MFE and MTI in federal district court in Colorado (the "Colorado Court") for racial

---

[2] We have taken judicial notice of the bankruptcy court docket and various documents filed through the electronic docketing system. *See O'Rourke v. Seaboard Sur. Co. (In re E.R. Fegert, Inc.)*, 887 F.2d 955, 957-58 (9th Cir. 1989); *Atwood v. Chase Manhattan Mortg. Co. (In re Atwood)*, 293 B.R. 227, 233 n.9 (9th Cir. BAP 2003).

discrimination, retaliation, and a hostile work environment. In February 2015, after a jury trial and verdict, the Colorado Court entered a judgment against MFE and MTI, jointly and severally, for a total of $968,100 in compensatory damages and $14 million in punitive damages (the "Discrimination Judgment").

Subsequently, the parties filed certain post-trial motions before the Colorado Court, including a motion filed by the Camara Creditors requesting approximately $2.3 million in attorneys' fees. Debtors disputed the amount of this liability and filed their own post-trial motions.

Soon thereafter, while these motions were pending in the Colorado Court, MFE filed a chapter 11 petition (the "2015 Case"). The Camara Creditors promptly filed proofs of claim totaling $17,882,182.46. The proofs of claim were based on the $14,968,100 Discrimination Judgment, the

---

Debtors filed a motion to strike certain documents from the Camara Creditors' designation of the record on the basis that such documents were not presented to the bankruptcy court. The Camara Creditors, in turn, moved for leave to amend the designation of record to include the documents.

Courts "may take judicial notice of proceedings in other courts, both within and without the federal judicial system, if those proceedings have a direct relation to matters at issue." *United States ex rel. Robinson Rancheria Citizens Council v. Borneo, Inc.*, 971 F.2d 244, 248 (9th Cir. 1992) (citations modified). Here, all of the documents disputed by Debtors are court filings that are public record and directly relate to the matters at issue on appeal.

Moreover, although Debtors assert that they dispute the meaning of the documents, Debtors do not articulate any specific dispute. Debtors do not, for instance, dispute the authenticity of the documents. We DENY Debtors' motion to strike the documents and GRANT the Camara Creditors' cross-motion for leave to file their amended designation of record.

Camara Creditors' requests for attorneys' fees and costs, and pre- and post-judgment interest.

In November 2015, MFE and MTI made an offer of compromise to the Camara Creditors, which the Camara Creditors accepted (the "2015 Settlement"). As relevant to this appeal, the 2015 Settlement provided that: (i) MTI would make an initial payment of $185,714 to each of the Camara Creditors; (ii) on the effective date of a confirmed chapter 11 plan, MFE would pay $142,857 to each of the Camara Creditors; and (iii) thereafter, MFE and/or MTI would make 32 quarterly payments totaling $714,286 to each of the Camara Creditors. Altogether, this portion of the 2015 Settlement provided for payments totaling $7,299,999 to the Camara Creditors (the "Payment Scheme").

The 2015 Settlement additionally provided that, upon default, the Camara Creditors would be able to file a stipulated judgment totaling $10 million, less any payments received, with the Colorado Court (the "Judgment Clause"). The parties further agreed that, in the event of a default, the Camara Creditors "will be able to execute on their Stipulated Judgment against MTI, as well as pursue their claims against [MFE] under this agreement as contract creditors of [MFE]."

In December 2015, MFE and MTI, as a co-proponent, proposed a plan of reorganization (the "2015 Plan"). The 2015 Plan incorporated the terms of the 2015 Settlement. Eventually, the bankruptcy court confirmed the 2015 Plan.

MFE and MTI made several payments to the Camara Creditors in accordance with the 2015 Settlement and 2015 Plan. The parties do not dispute that, by 2022, MFE and MTI paid $6,206,249 of the $7,299,999 required under the 2015 Settlement and 2015 Plan.

**B.      The current bankruptcy cases and confirmation of a plan**

In May 2022, MFE filed its chapter 11 petition. After failing to make the quarterly payment owed to the Camara Creditors in July 2022, MTI also filed for bankruptcy protection.[3]

Subsequently, Debtors proposed a joint plan of liquidation (the "Current Plan"). As relevant here, the Current Plan classified the Camara Creditors' claims as general unsecured claims to be treated under Class 7. The Current Plan proposed paying Class 7 general unsecured creditors 25.98% of their claims pro rata with other general unsecured creditors.

The Current Plan was silent with respect to the nature of the Camara Creditors' claims; in other words, the Current Plan did not specify that the Camara Creditors' claims stemmed from a punitive damages award. Instead, the Current Plan simply grouped the Camara Creditors' claims with other general unsecured claims.

The Current Plan also provided that, post-confirmation, the plan administrator appointed through the Current Plan "shall retain, and may seek to prosecute, any objections to the allowance of any Administrative

---

[3] In May 2022, debtor Matheson Postal Services, Inc. also filed a chapter 11 petition.

Claim and any Claim in Class 6, Class 7, Class 8, or Class 9 on any ground, including that such claim should be subject to subordination under Bankruptcy Code section 510 or other applicable law." Current Plan, Article 9.1.

Along with the Current Plan, Debtors filed a disclosure statement (the "Disclosure Statement"). In the Disclosure Statement, Debtors set forth their liquidation analysis under § 1129(a)(7). The liquidation analysis focused on the fact that conversion to chapter 7 would result in significant additional administrative expenses based on the appointment of a chapter 7 trustee. Debtors also attached an exhibit to the Disclosure Statement specifying the projected recoveries for creditors in a chapter 7 as compared to the Current Plan. Additionally, Debtors submitted briefing in connection with confirmation of the Current Plan. In their brief, Debtors argued that the Current Plan complied with all applicable provisions of § 1129(a), including § 1129(a)(7).

Both the Disclosure Statement and Debtors' briefing were silent with respect to subordination under § 726(a)(4) in a hypothetical chapter 7 case. All of Debtors' submissions in support of confirmation asserted that the Current Plan, as structured, satisfied every requirement of § 1129(a).

In October 2024, the bankruptcy court entered an order confirming the Current Plan (the "Confirmation Order"). The Confirmation Order provided that the bankruptcy court "determined that all of the

requirements for confirmation of the [Current] Plan have been satisfied, including those set forth in 11 U.S.C. § 1129(a) . . . ."

**C.      The objection to the Camara Creditors' claims**

Approximately four months post-confirmation, Debtors filed an objection to the Camara Creditors' claims (the "Objection to Claim"). In the Objection to Claim, Debtors argued that the Camara Creditors' claim should be subordinated because all remaining payments owed to the Camara Creditors stemmed from the Colorado Court's punitive damages award. Debtors' argument mainly focused on the equitable principle that creditors with actual pecuniary loss should be paid ahead of creditors owed punitive damages. Debtors primarily relied on § 510(c) as the legal basis for subordination of punitive damages claims.

In connection with this argument, Debtors also mentioned that the liquidation analysis set forth in § 1129(a)(7) required subordination because, in a hypothetical chapter 7 case, punitive damages claims would be subordinated under § 726(a)(4), thus yielding a greater recovery for certain creditors who otherwise had to share pro rata with the Camara Creditors in the Current Plan.

In the Objection to Claim, Debtors also requested disallowance of a portion of the Camara Creditors' claim. Specifically, Debtors noted that the Camara Creditors' claim originated from two parts of the 2015 Settlement: (i) first, the Camara Creditors requested $1,093,750, which represented the amount still owing under the Payment Scheme; and (ii) second, the Camara

8

Creditors requested $2.7 million, which represented the amount owed by MTI under the Judgment Clause. Debtors did not contest the amount owed pursuant to the Payment Scheme, but argued that the Judgment Clause constituted an unenforceable penalty because it was disproportionate to the actual damages sustained by the Camara Creditors.

The Camara Creditors opposed the Objection to Claim. In their opposition, the Camara Creditors argued that: (i) the 2015 Settlement and 2015 Plan converted their claim for punitive damages to a contract claim, and the 2015 Plan had a res judicata effect on the allowability of the Camara Creditors' claims in the current cases; (ii) inequitable conduct was required to equitably subordinate a claim under § 510(c), which Debtors had not demonstrated; and (iii) Debtors were judicially estopped from arguing that the Judgment Clause was an unenforceable penalty.

In July 2025, the bankruptcy court issued a decision subordinating the Camara Creditors' claim and disallowing $2.7 million of the claim as an unenforceable penalty. The court first reasoned that, pursuant to the Supreme Court's decisions in *Archer v. Warner*, 538 U.S. 314 (2003), and *Brown v. Felsen*, 442 U.S. 127 (1979), the court had the ability to look behind the 2015 Settlement to assess the nature of the debt owed to the Camara Creditors. In doing that, the court held that the debt originated from a punitive damages award.

The court then concluded that, as punitive damages, the Camara Creditors' claim must be subordinated under § 1129(a)(7). As the

9

bankruptcy court explained, § 1129(a)(7) requires a showing that creditors will not receive less through a plan than a chapter 7 liquidation; because § 726(a)(4) would apply in a chapter 7 case to subordinate claims arising from punitive damages, certain creditors would receive more in a chapter 7 liquidation because their claims would be paid ahead of the Camara Creditors, whereas, through the Current Plan, they would be paid pro rata in the same class as the Camara Creditors.

Finally, the court held that $2.7 million of the Camara Creditors' claim must be disallowed as an unenforceable penalty under Nevada law. The court reasoned that it would be disproportionate to compel Debtors to pay $2.7 million under the Judgment Clause as a "fixed charge" notwithstanding the actual damages sustained by the Camara Creditors.

In accordance with its decision, the court entered an order sustaining the Objection to Claim (the "Subordination Order"). The Camara Creditors timely appealed.

## JURISDICTION

The bankruptcy court had jurisdiction under 28 U.S.C. §§ 1334 and 157(b)(2)(B) and (O). We have jurisdiction under 28 U.S.C. § 158.

## ISSUES

1. Did the bankruptcy court err in applying *Brown* and *Archer* to characterize the Camara Creditors' claim as punitive damages?

2. Did the bankruptcy court err in subordinating the Camara Creditors' claim under § 1129(a)(7)?

3. Did the bankruptcy court err in disallowing $2.7 million of the Camara Creditors' claim under Nevada law?

## STANDARDS OF REVIEW

A bankruptcy court's order allowing or disallowing a proof of claim is reviewed for abuse of discretion. *See Burlington N. R.R. Co. v. Dant & Russell, Inc. (In re Dant & Russell, Inc.)*, 853 F.2d 700, 707 (9th Cir. 1988); *Bitters v. Networks Elec. Corp. (In re Networks Elec. Corp.)*, 195 B.R. 92, 96 (9th Cir. BAP 1996). A bankruptcy court abuses its discretion if it applies the wrong legal standard or its findings are illogical, implausible or without support in the record. *TrafficSchool.com, Inc. v. Edriver Inc.*, 653 F.3d 820, 832 (9th Cir. 2011).

"We review the bankruptcy court's findings of fact for clear error; we review its conclusions of law de novo." *Adinolfi v. Meyer (In re Adinolfi)*, 543 B.R. 612, 614 (9th Cir. BAP 2016) (citation omitted).

"Whether a person's due process rights have been violated is a mixed question of law and fact, which is reviewed de novo." *Hasso v. Mozsgai (In re La Sierra Fin. Servs., Inc.)*, 290 B.R. 718, 726 (9th Cir. BAP 2002). Under a de novo review, "we look at the matter anew . . . giving no deference to the bankruptcy court's determinations." *Barnes v. Belice (In re Belice)*, 461 B.R. 564, 572 (9th Cir. BAP 2011) (quoting *Charlie Y., Inc. v. Carey (In re Carey)*, 446 B.R. 384, 389 (9th Cir. BAP 2011)).

## DISCUSSION

On appeal, the Camara Creditors argue that the court erred by: (i) characterizing their claims as punitive damages, (ii) subordinating their claim under § 726(a)(4), which the Camara Creditors contend does not apply in chapter 11 cases; and (iii) disallowing a portion of their claim as an unenforceable penalty.

As we discuss in section A, we disagree with the Camara Creditors' analysis of *Brown* and *Archer*, and agree with the bankruptcy court's conclusion that those cases allowed the court to look behind the 2015 Settlement to ascertain the nature of the Camara Creditors' claims.

However, as we discuss in section B, we believe the bankruptcy court erred in applying § 1129(a)(7) in a manner that is inconsistent with the plain language of the Code. And, as we discuss in section C, we further believe the bankruptcy court erred in disallowing a portion of the Camara Creditors' claim as an unenforceable penalty.

**A.** **The bankruptcy court did not err in characterizing the Camara Creditors' claim as punitive damages.**

Prior to assessing whether the bankruptcy court properly subordinated the Camara Creditors' claim, we must decide whether the court appropriately characterized the claim as punitive damages.

The Camara Creditors argue that the 2015 Settlement and 2015 Plan converted their punitive damages claim into a contract claim. Although the Camara Creditors refrain from using the word "novation," in essence, they

assert that the 2015 Settlement and 2015 Plan "worked a kind of novation." *Archer*, 538 U.S. at 323.

On this issue, the bankruptcy court correctly held that *Brown* and *Archer* control. In *Brown*, the Supreme Court considered whether the doctrine of claim preclusion prevented bankruptcy courts from looking beyond a settlement incorporated into a state court judgment to assess whether the claim arose from fraud and was thus subject to nondischargeability. *Brown*, 442 U.S. at 138-39. Noting that Congress gave bankruptcy courts broad powers to resolve the dischargeability of a debt, the Court concluded that claim preclusion did not bar bankruptcy courts' inquiries into the true nature of a debt, even where the debt was liquidated in a settlement agreement. *Id.*

Years later, in *Archer*, the Court again revisited the impact of a settlement agreement on a bankruptcy court's ability to assess the nature of a debt for purposes of nondischargeability litigation. *Archer*, 538 U.S. at 318-19. As in *Brown*, the Court held that the prepetition settlement agreement did not interfere with the bankruptcy court's ability to parse whether the debt is dischargeable under the Code. *Id.* at 323. In so holding, the Court expressly stated that even a novation that transformed a tort liability to a contract liability would not prevent a bankruptcy court from analyzing the nature of a claim for purposes of the Code. *Id.*

The Camara Creditors' primary argument against application of *Brown* and *Archer* is that those cases apply only to determinations of

13

nondischargeability under § 523. But the Court did not so limit its holding, and subsequent cases have applied *Brown* and *Archer* to support a bankruptcy court's ability to look beyond a settlement agreement in other contexts. *See, e.g., Orange Cnty. Nursery, Inc. v. Minority Voting Tr. (In re Orange Cnty. Nursery Inc.)*, 523 B.R. 692, 699 (C.D. Cal. 2014) ("[T]he Supreme Court has 'looked behind' a state court judgment in interpreting other provisions of the bankruptcy code, and to do so makes sense in the context of Section 510(b)."); *Peltz v. Vancil, Inc. (In re Bridge Info. Sys., Inc.)*, 327 B.R. 382, 386–87 (8th Cir. BAP 2005), *aff'd*, 474 F.3d 1063 (8th Cir. 2007) (using the reasoning of *Archer* to determine the nature of a claim in the context of preference litigation under § 547).

As this Panel recently observed in the context of allowance of claims, "simply, *Archer* provides that there is no overall bankruptcy law prohibition on looking past a settlement agreement in performing a central purpose of the bankruptcy laws, including the allowance of claims." *Enpark Landscape, LLC v. AKF, Inc. (In re Enpark Landscape, LLC)*, BAP No. NV-23-1182-PLC, 2024 WL 4328581, at *6 (9th Cir. BAP Sept. 27, 2024); *see also In re Orange Cnty. Nursery Inc.*, 523 B.R. at 699 ("Looking behind the judgment prevents claimants from characterizing their claims to avoid the reach of" the subordination provisions in the Code.).

Nor are we persuaded by the Camara Creditors' assertion that *Brown* and *Archer* do not apply because the 2015 Settlement agreement was

incorporated into a chapter 11 plan. First, nothing in the 2015 Plan purports to change the characterization of the punitive damages award.

Second, and more crucially, even if the 2015 Plan contained such language, it is doubtful that *Brown* and *Archer* would be rendered inapplicable. Ultimately, *Brown* and *Archer* simply reaffirm Congress's grant of power to bankruptcy courts to effectuate the Code by giving them the ability to consider the true nature of a debt despite the subsequent conversion of that claim into a settlement agreement or judgment.[4]

Based on the foregoing, we are not persuaded by the Camara Creditors' arguments that the 2015 Settlement and/or 2015 Plan prevented the bankruptcy court from characterizing the Camara Creditors' claims as arising from a punitive damages award.

## B. The bankruptcy court erred in subordinating the Camara Creditors' claim under § 1129(a)(7).

The Code provides two potential statutory paths to subordination of a punitive damages claim.

A straightforward statutory path is via equitable subordination under § 510(c), which is available in all chapters. *See* § 103(a). However, as the bankruptcy court correctly observed in its decision, the Supreme Court has held that bankruptcy courts lack the power to *categorically* subordinate claims under § 510(c). *See United States v. Noland*, 517 U.S. 535, 542-43

---

[4] For this reason, we also find irrelevant the 2015 Settlement's use of the term "contract creditors" to refer to the Camara Creditors.

(1996); *see also United States v. Reorganized CF & I Fabricators of Utah, Inc.*, 518 U.S. 213, 228–29 (1996). While neither of these cases prevent bankruptcy courts from equitably subordinating a claim based on punitive damages on a case-by-case basis after making the relevant factual findings for subordination under § 510(c), the bankruptcy court here refused to make any findings or conclusions under § 510(c), resting its decision instead on § 1129(a)(7).[5]

An alternative statutory path for subordination of a punitive damages claim is § 726(a), which provides the priority scheme in chapter 7 liquidations and places claims of punitive damages in lower priority than general unsecured creditors.

The Camara Creditors contend that, pursuant to § 103(b), § 726(a) is inapplicable in a chapter 11 case. § 103(b) ("Subchapters I and II of chapter 7 of this title apply only in a case under such chapter."). But the analysis is not so simple. For one, the Supreme Court has made clear that, although the Code "provides somewhat more flexibility for distributions pursuant to Chapter 11 plans," courts may not otherwise violate the priority scheme in

---

[5] In their appellate brief, Debtors argue that the record supports equitable subordination of the Camara Creditors' claims as an alternative basis to affirm the court's Subordination Order. But we decline the invitation to act as factfinder and rule on this issue before the bankruptcy court has had an opportunity to do so. Debtors are free to move for equitable subordination of the Camara Creditors' claim on remand.

§ 726 outside the plan confirmation context. *Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451, 457 (2017).

But even in the context of plan confirmation, which does allow for reordering of priorities if certain conditions are met, courts may need to consult the priority scheme set forth in § 726(a) as part of the liquidation analysis inquiry set forth in § 1129(a)(7). Section 1129(a)(7) provides that a plan may be confirmed only if, with respect to each impaired class of claims or interests:

> (A) each holder of a claim or interest of such class—
>
>> (i) has accepted the plan; or
>>
>> (ii) will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of this title on such date . . . .

§ 1129(a)(7)(A)(i)-(ii). Put simply for purposes of this appeal, § 1129(a)(7) requires either that each holder of a claim in a class accepts the plan, § 1129(a)(7)(A)(i), or that the holder will not receive less than it would in a chapter 7 liquidation. § 1129(a)(7)(A)(ii).[6]

We take no issue with the bankruptcy court's conclusion that courts may consult § 726(a) to assess whether § 1129(a)(7)(A)(ii) has been satisfied.

---

[6] Courts frequently refer to the analysis under § 1129(a)(7)(A)(ii) as the "liquidation analysis" or "best interest of creditors test."

17

Certainly, had the bankruptcy court conducted its liquidation analysis at the time of confirmation, subordination of the Camara Creditors' claim might have been appropriate.[7]

Our concern lies instead with the preclusive effect of the Current Plan and the court's post-confirmation application of § 1129(a), a statute which, by its own language, applies only for the purpose of confirmation and must be satisfied *at the time of confirmation*. As noted above, prior to confirming a plan, a bankruptcy court must conclude that every subsection of § 1129(a), including § 1129(a)(7), has been satisfied. § 1129(a) ("The court shall confirm a plan *only if* all of the following requirements are met . . . .") (emphasis added). Because of this, there are a few problems with the bankruptcy court's post-confirmation application of § 1129(a).

---

[7] The record reflects that not every holder of a claim in Class 7 – the class in which the Camara Creditors' claim was placed – voted to accept the Current Plan. As a result, Debtors were required to engage in a liquidation analysis under § 1129(a)(7)(A)(ii). However, it is unclear from the record whether including the Camara Creditors within the general unsecured creditors resulted in a projected distribution to the unsecured creditors that would have been less than what they would get in the hypothetical chapter 7 case detailed in the court-approved Disclosure Statement. Neither the parties nor the court addressed this issue, but it is worth noting that subordination would not be necessary to satisfy § 1129(a)(7)(A)(ii) unless such subordination would impact the distribution to other creditors in a hypothetical chapter 7 case.

In any event, to the extent Debtors now believe that the Current Plan violated § 1129(a)(7)(A)(ii), the Current Plan is nevertheless final and enforceable. *United Student Aid Funds v. Espinosa*, 559 U.S. 260, 275 (2010) (confirmed plan remained enforceable and binding even though confirmation of the plan violated § 523(a)(8)).

18

First, the plain language of the statute does not contemplate application of § 1129(a) in any context outside of confirmation. By stating that courts can confirm a plan "only if all" requirements under § 1129(a) are met, the statute makes clear that Congress intended to make satisfaction of § 1129(a) a precondition to confirmation of a plan. Logically, then, § 1129(a) must be satisfied prior to confirmation, and, by its own terms, is inapplicable in the post-confirmation context.

The only statutory exception Congress created to § 1129(a)'s pre-confirmation application is in § 1127, which provides that a plan proponent may modify a plan post-confirmation "before substantial consummation of such plan," and then only if the modified plan meets the requirements of §§ 1122 and 1123, "circumstances warrant such modification" and the bankruptcy court, "after notice and a hearing, confirms such plan as modified, under section 1129 of this title." § 1127(b). Section 1127(c) also requires modified plans to provide adequate disclosures and follow the solicitation requirements of § 1125.

Here, Debtors did not move for modification of the Current Plan under § 1127(b), and nothing in the record suggests that the bankruptcy court made any findings of fact or conclusions of law related to the requirements of § 1127(b) or (c). Outside of the court's ability to confirm a modified plan if all the requirements of § 1127(b) are met, which

19

requirements incorporate § 1129(a), the bankruptcy court lacked authority to apply § 1129(a) to subordinate a claim post-confirmation.[8]

Next, the Confirmation Order precluded relitigation of the very same issues resolved by the Confirmation Order, i.e., whether the Current Plan satisfied the requirements of § 1129(a). An order confirming a bankruptcy plan is "binding on all parties and all questions that could have been raised pertaining to the plan are entitled to *res judicata* effect." *Trulis v. Barton*, 107 F.3d 685, 691 (9th Cir. 1995). This is so "even if the confirmed bankruptcy plan contains illegal provisions." *Great Lakes Higher Educ. Corp. v. Pardee (In re Pardee)*, 193 F.3d 1083, 1086 (9th Cir. 1999) (citing *Trulis*, 107 F.3d at 691).

The Confirmation Order explicitly stated that the bankruptcy court "determined that all of the requirements for confirmation of the [Current] Plan have been satisfied, including those set forth in 11 U.S.C. § 1129(a)."[9] Obviously, this would include the liquidation analysis required under § 1129(a)(7). Thus, entry of the Confirmation Order precluded future litigation of all questions regarding § 1129(a) that were or could have been raised. *Trulis*, 107 F.3d at 691.

---

[8] During oral arguments, Debtors argued that § 502(b)(1), which provides for disallowance of claims under "applicable law," granted the bankruptcy court statutory authority to subordinate the Camara Creditors' claim under § 1129(a)(7). But for all the reasons discussed herein, § 1129(a)(7) does not qualify as "applicable law" outside of the context of confirmation.

[9] Even if the Confirmation Order did not include this language, the bankruptcy court would have necessarily had to decide that the Current Plan satisfied all requirements of § 1129(a) to confirm the Current Plan.

Debtors' primary argument in support of subordination under § 1129(a)(7) is that the Current Plan reserved their right to seek post-confirmation subordination of the Camara Creditors' claim. Specifically, the Current Plan provides that "the Plan Administrator shall retain, and may seek to prosecute, any objections to the allowance of . . . any Claim in Class 6, Class 7, Class 8, or Class 9 on any ground, including that such claim should be subject to subordination under Bankruptcy Code section 510 or other applicable law." Current Plan, Article 9.1.

The proposition that debtors may use a chapter 11 plan to modify Congress's intended use and purpose of a statute is questionable. But even if plan proponents may modify statutes through confirmation of a plan, the language in the Current Plan was much too vague to contemplate subordination of the Camara Creditors' claim under a theory that erroneously utilizes a confirmation statute for non-confirmation purposes.

As both the Ninth Circuit Court of Appeals and this Panel have recently observed, a party is entitled to some measure of *clear* and *unambiguous* notice when the party's rights are impacted by a chapter 11 case. *See Munding v. Masingale (In re Masingale)*, 108 F.4th 1195, 1205-07 (9th Cir. 2024); *Solimano Framing Grp. v. Pier Constr. & Dev., LLC (In re Solimano Framing Grp.)*, 664 B.R. 803, 813 (9th Cir. BAP 2024).[10] In addition, a

---

[10] We recognize that the facts in this case are slightly different from *Masingale* and *Solimano Framing*. In those cases, the debtors affirmatively sought to capitalize on their prior lack of clarity. Here, in their post-confirmation Objection to Claim, Debtors mainly sought subordination under § 510(c), which the Current Plan explicitly contemplated.

cornerstone of the confirmation process is the statutory mandate to provide adequate disclosures so that creditors who vote to accept a plan do so with informed consent. § 1125(a). Given that creditors rely on the classification of their claim within a specific class in deciding whether to accept or reject a plan, adequate disclosures surrounding classification are crucial.[11]

Nothing in the language of the Current Plan fairly placed the Camara Creditors on notice that their claim – or any creditors' claim – was subject to post-confirmation subordination under § 1129(a), a statute that all parties would reasonably expect to be applied only at the time of confirmation.[12] Nor did the liquidation analysis in the Current Plan mention the potential subordination of punitive claims. Instead, Debtors merely argued that § 1129(a)(7) was satisfied because a chapter 7 liquidation would increase administrative expenses and the bankruptcy

---

Debtors only briefly mentioned § 1129(a)(7) as an alternative basis supporting equitable subordination, and likely did not anticipate that the bankruptcy court would rest its subordination decision entirely on § 1129(a)(7). Thus, it does not appear that Debtors actively sought to mislead the Camara Creditors. Nevertheless, pursuant to *Masingale* and *Solimano Framing*, the Camara Creditors were still entitled to fair notice of any impact the Current Plan may have had on their post-confirmation rights.

[11] As discussed below, we are not suggesting that a debtor can never move to subordinate or reclassify a claim post-confirmation, but rather that such subordination and/or reclassification must comply with the Code, including by providing adequate disclosures regarding the potential for post-confirmation subordination.

[12] Contrary to Debtors' position in their briefs, post-confirmation subordination under § 1129(a) is not analogous to post-confirmation disallowance of claims. Disallowance of claims does not require application of § 1129(a) or any other statutes that are inapplicable in the post-confirmation context, nor is disallowance of claims a precondition to confirmation of a plan.

court, in holding that all subsections of § 1129(a) were satisfied, appears to have agreed that Debtors' liquidation analysis passed muster on this basis alone. As a result, the Current Plan failed to adequately reserve any right for Debtors to seek post-confirmation subordination under § 1129(a)(7).

Notably, had Debtors explicitly set forth the possibility of post-confirmation subordination under § 1129(a)(7) in their Current Plan, there might have been less of a disconnect between the Current Plan, as confirmed, and post-confirmation utilization of § 1129(a)(7). Moreover, such explicit language may have triggered objections to confirmation not only from the Camara Creditors but from other interested parties impacted by the proposed subordination; in fact, the very purpose of confirmation proceedings is to resolve all such issues and objections prior to confirmation. Debtors' failure to be explicit in the Current Plan deprived both Debtors and interested parties of this process.

It is important to note that our analysis herein does not foreclose debtors from seeking post-confirmation modifications of confirmed plans or from requesting subordination of claims under other applicable authorities, such as § 510. Our conclusion is simply that such post-confirmation actions must comply with the Code. On remand, Debtors are free to pursue subordination under alternative theories, or to move for modification of the Current Plan under § 1127.

We also are not holding that a chapter 11 plan can *never* reserve an issue under § 1129(a) for post-confirmation adjudication, although it is

23

difficult to conceive of a scenario where a court might confirm a plan without deciding that every subsection of § 1129(a) has been satisfied. For purposes of this appeal, it is enough that: (i) the language in the Current Plan was wholly inadequate to revive § 1129(a) for post-confirmation usage; (ii) the Current Plan did not place the Camara Creditors on notice that their claim was at risk of post-confirmation subordination under § 1129(a), a statute that would have to be satisfied at the time of confirmation; and (iii) Debtors did not move to modify the Current Plan as statutorily allowed under § 1127.

Because the bankruptcy court lacked statutory authority to apply § 1129(a)(7) outside of confirmation, and because the Confirmation Order precluded relitigation of issues arising under § 1129(a), the bankruptcy court erred in subordinating the Camara Creditors' claim under § 1129(a)(7).

## C.  The bankruptcy court erred in disallowing $2.7 million of the Camara Creditors' claim.

The bankruptcy court disallowed $2.7 million of the Camara Creditors' claim on the basis that the Judgment Clause, from which this portion of the Camara Creditors' claim originated, was a liquidated damages provision that amounted to an unenforceable penalty.

Under Nevada law,[13] liquidated damages provisions "serve as a good-faith effort to fix the amount of damages when contractual damages

---

[13] The parties do not dispute that Nevada law governs interpretation of both the

24

are *uncertain or immeasurable.*" *Khan v. Bakhsh*, 306 P.3d 411, 414 (2013) (emphasis added); *see also Mason v. Fakhimi*, 865 P.2d 333, 335 (1993) (liquidated damages are "arrived at by a good faith effort to estimate the actual damages that will probably ensue from a breach").

As a preliminary matter, we question whether the Judgment Clause is a liquidated damages provision at all. The bankruptcy court did not provide its reasoning for holding that the Judgment Clause qualified as a liquidated damages provision, instead jumping directly to its analysis that the Judgment Clause was an unenforceable penalty.

But the record does not reflect that the Judgment Clause was implemented to estimate uncertain or immeasurable damages. To the contrary, the purpose of the 2015 Settlement was to settle damages that were already liquidated or easily ascertainable. By the time the parties executed the 2015 Settlement, the Camara Creditors had filed proofs of claim totaling $17,882,182.46 based on the $14,968,100 Discrimination Judgment as well as additional, easily ascertainable damages like attorneys' fees and interest.

Given that the total possible recovery in the event of a breach of the 2015 Settlement was $10,000,000 (as further discussed below), i.e., much less than $17,882,182.46, it appears that the 2015 Settlement, including the

_____

2015 Settlement and the 2015 Plan.

Judgment Clause, was meant to settle and adjust the existing debt owed by Debtors instead of estimating unascertainable future damages.

Nevertheless, even if we assume that the Judgment Clause is a liquidated damages provision, the bankruptcy court erred in concluding that the provision is an unenforceable penalty. A provision amounts to an unenforceable penalty where it "is a sum inserted in a contract, not as the measure of compensation for its breach, but rather as punishment for default, or by way of security for actual damages which may be sustained by reason of non-performance, and it involves the idea of punishment . . . ." *Mason*, 865 P.2d at 335 (citing 22 Am. Jur. 2d Damages § 684 (1980)). To prove that a liquidated damages provision "constitutes a penalty, the challenging party must persuade the court that the liquidated damages are disproportionate to the actual damages sustained by the injured party." *Id.*

In their respective analyses of this issue, both the parties and the bankruptcy court assessed proportionality based on a specific time of breach. The bankruptcy court relied heavily on a hypothetical where a breach would occur when there was only one installment payment left, whereas the Camara Creditors argue that damages must be assessed at the time of breach.

The case law does not support this type of snapshot analysis. All the Supreme Court of Nevada requires is that a liquidated damages provision not be grossly disproportionate to damages actually sustained by a party. Of course, in a case where the first instance of damages is sustained by the

breach itself, courts must necessarily assess damages at the time of breach, as the Camara Creditors contend.

But none of the cases cited by the parties or the bankruptcy court involve a settlement of a preexisting judgment and other damages flowing therefrom.[14] In a contract that aims to resolve a preexisting debt, such as the 2015 Settlement, it would seem the best way to conform to the Nevada courts' proportionality test and determine whether a provision is meant as punishment would be to compare all actual damages sustained by a party with the maximum possible recovery under the so-called liquidated damages provision.

Here, the maximum possible recovery under the 2015 Settlement is $10,000,000. Pursuant to the 2015 Settlement, in the event of a default, the Camara Creditors could both: (i) enter a judgment against MTI in the amount of $10,000,000, less any amounts paid, and (ii) pursue a judgment for breach of contract against MFE for $7,299,999, less any amounts paid. Although the potential judgments against MFE and MTI could total $17,299,999 based on this structure, the 2015 Settlement also provided that any amount paid towards the $7,299,999 liability would reduce the $10,000,000 liability in an equal amount. As a result, the Camara Creditors could recover, at most, $10,000,000 in accordance with the 2015 Settlement. Given that this amount would be less than the actual damages sought by

---

[14] Perhaps understandably, because, as discussed above, actual damages are easily ascertainable in such cases.

the Camara Creditors in the amount of $17,882,182.46, and also less than the already liquidated judgment of $14,968,100, it is unclear how the Judgment Clause could qualify as a penalty that is disproportionate to the Camara Creditors' actual damages.

We acknowledge that it is tempting to label the Judgment Clause a penalty where, had there been no default under the Payment Scheme, MTI would owe $0 under the Judgment Clause, and Debtors' obligations under the 2015 Settlement would have been satisfied after payment of only $7,299,999. Because of the nature of this payment structure, the urge to characterize the $7,299,999 owed pursuant to the Payment Scheme as the "actual damages" owed for breach of the contract is understandable.

Nevertheless, it is difficult to ignore the fact that both MFE and MTI were jointly and severally liable for damages up to $17,882,182.46. As a result, the 2015 Settlement – whether via the Payment Scheme or the Judgment Clause – only reduced their potential liability. Ultimately, the 2015 Settlement benefitted MFE and MTI by capping the damages they would owe the Camara Creditors. For instance, even in the scenario of an instant breach, MFE and MTI would only be liable in the amount of $7,299,999 and $10,000,000, respectively, instead of the $17,882,182.46 the Camara Creditors claimed in the 2015 Case.[15]

---

[15] We also note that the 2015 Settlement was styled as an offer of compromise *by MFE and MTI*. Debtors do not dispute that they in fact offered the subject compromise to the Camara Creditors. It is unlikely that a party that offers to settle a debt for a lesser amount can also be deemed to have been punished by its own offer of compromise.

Under the facts of this case, the bankruptcy court's conclusion that the Judgment Clause was an unenforceable penalty is not supported by the facts of this case or Nevada law on unenforceable penalties. As such, the bankruptcy court abused its discretion in disallowing $2.7 million of the Camara Creditors' claim.

## CONCLUSION

For the reasons set forth above, we REVERSE the Subordination Order and REMAND this matter for further proceedings consistent with this decision.

Concurrence begins on next page.

SPRAKER, Bankruptcy Judge, concurring:

I join in Sections A and C of the decision and agree with the result reached in Section B. I write separately because I view the subordination issue as limited to a question under § 726(a)(4) rather than § 1129(a)(7) as predominantly discussed in the decision. However, Debtors never sought to relitigate confirmation or modify their plan, and § 1129(a)(7) does not speak of subordination. Instead, Debtors objected to the Camara Creditors' claims—and sought to subordinate their claims for punitive damages— several months after plan confirmation. The bankruptcy court applied § 726(a)(4) to subordinate the Camara Creditors' claims. Relying on § 726(a)(4), the court held that "[i]f a chapter 11 plan provides for liquidation, then the subordinations inherent in the chapter 7 bankruptcy waterfall become mandatory." Thus, according to the bankruptcy court, § 726(a)(4) mandated the categorical subordination of the Camara Creditors' punitive damage claims.

But § 726 does not apply in chapter 11. To the contrary, § 103(b) expressly provides: "Subchapters I and II of chapter 7 of this title apply only in a case under such chapter." Courts have previously recognized that the unambiguous language of § 103(b) precludes direct application of § 726(a) in chapter 11. *See, e.g.*, *In re Hyatt*, 509 B.R. 707, 719 n.14 (Bankr. D.N.M. 2014) (quoting § 103(b) and stating "[a]lthough punitive damages claims are statutorily subordinated under 11 U.S.C. 726(a)(4), that provision does not apply in Chapter 11 cases."); *see also Zante, Inc. v.*

30

*Delegado (In re Zante, Inc.)*, 467 B.R. 216, 219 (D. Nev. 2012) ("After all, in Chapter 7 cases the Bankruptcy Code *mandates* precisely this discrimination. This is not a Chapter 7 case, however.") (emphasis in original); *In re Xpedior Inc.*, 354 B.R. 210, 225 (Bankr. N.D. Ill. 2006) ("Section 726 should only be applied to cases under Chapter 7.").

The only *potential* relevance of § 726(a) in chapter 11 relates to the liquidation analysis required by the best interest of creditors test imposed by § 1129(a)(7)(A)(ii) as a condition for confirmation.[16] The best interest test requires the debtor to prove that those creditors not accepting the plan will receive at least as much as they would in a hypothetical chapter 7 distribution. Where creditors hold claims for punitive damages or noncompensatory penalties, the projected chapter 7 distribution must apply the scheme mandated by § 726(a)(4) and account for the statutory subordination of those claims to the full payment of all timely and untimely unsecured claims. But nothing in § 1129(a)(7) imports § 726(a)(4) directly into chapter 11 cases—even liquidating cases. Rather, the best interest test simply requires chapter 11 debtors to account for the mandatory, statutory subordination of certain claims in projecting the chapter 7 distribution for their liquidation analysis. The chapter 11 debtor must pay creditors who do not accept its plan at least as much as they

---

[16] The Supreme Court has applied § 726(a) to structured dismissals in chapter 11. *Czyzewski*, 580 U.S. at 464-65. But that situation differs materially from a chapter 11 involving a confirmed plan.

would receive in the hypothetical chapter 7 distribution. Precisely how a debtor accomplishes this is left to the terms of the plan. *See In re Hyatt*, 509 B.R. at 720 (explaining that chapter 11 debtors may subordinate claims to comply with the best interest test through § 510(c)—or separate classification and treatment—in appropriate instances); *In re Zante, Inc.*, 467 B.R. at 219-20. Nothing in § 1129(a)(7), or otherwise in the Code, permits chapter 11 debtors to utilize § 726(a)(4) to mandatorily and categorically subordinate all punitive damages to the full payment of unsecured claims.[17]

All that § 1129(a)(7)(A)(ii) requires is a comparison of the debtor's proposed chapter 11 distribution against the projected, hypothetical distribution that would occur if the case was in chapter 7. Debtors' liquidation analysis in their final Disclosure Statement did exactly that. Debtors concluded that their general unsecured creditors, including the Camara Creditors, would receive more under their chapter 11 plan than

---

[17] The bankruptcy court chose not to address equitable subordination under § 510(c) in light of its application of § 726(a)(4). I agree with my colleagues that the case must be remanded for consideration of Debtors' arguments for subordination under § 510(c). Debtors have cited a handful of cases noting that courts have used their general equitable powers to subordinate punitive damages and penalties in chapter 11. *See, e.g.,* *In re Motors Liquidation Co.*, 604 B.R. 138, 142 (Bankr. S.D.N.Y. 2019); *In re Friedman's, Inc.*, 356 B.R. 766, 777-78 (Bankr. S.D. Ga. 2006); *Owens Corning v. Credit Suisse First Bos.*, 322 B.R. 719, 723–24 (D. Del. 2005). The clear language of § 103(b) and § 1129(a)(7) render these cases inapposite and preclude statutory subordination of such claims under § 726(a)(4). To what extent, if any, these cases may support equitable subordination under § 510(c) remains for further analysis by the bankruptcy court on remand.

they would in a hypothetical chapter 7. No one challenged the liquidation analysis or objected to confirmation of Debtors' final plan under § 1129(a)(7). And the bankruptcy court confirmed Debtors' final plan, holding that it satisfied all the requirements of § 1129(a), including the best interest test found in § 1129(a)(7)(A)(ii).

The Confirmation Order was never appealed and is final. All confirmation issues are necessarily beyond the scope of this appeal. To the extent that Debtors erroneously sought and obtained confirmation of their plan in violation of the best interest test imposed under § 1129(a)(7), the confirmation order precludes relitigation of that issue. *Espinosa*, 559 U.S. at 275. Moreover, no party in interest has sought relief from the Confirmation Order or asked to modify the plan. Debtors' claim objection never sought such relief. This appeal does not involve reexamination of confirmation or modification of the plan or any analysis under § 1129(a).

To the extent that § 726(a)(4) applied at all to Debtors' chapter 11, it applied to confirmation of their plan. Those questions have been asked and answered. Interestingly, neither Debtors, nor the bankruptcy court, nor this Panel's decision, addressed whether inclusion of the Camara Creditors' claims for $3,793,750 within the general unsecured class actually violated the best interest test. Yet a simple mathematical calculation shows that even if the Camara Creditors' claims were removed from the projected, hypothetical chapter 7 distribution, the general unsecured creditors still received more through the chapter 11 plan than a projected hypothetical

33

chapter 7 distribution that categorically subordinated the Camara Creditors' claims under § 726(a)(4). This is all that the best interest test required. *Cf. In re Zante, Inc.*, 467 B.R. at 219 (separate classification to subordinate punitive damage claims would unfairly discriminate under § 1129(b) where no dilution of other creditors would occur).

In sum, this analysis illustrates the limited application of § 726(a)(4) in chapter 11. It is merely a component of the liquidation analysis to determine the amount creditors would be paid in a hypothetical chapter 7 distribution. So long as the creditors will receive at least as much under the chapter 11 plan as they would in a hypothetical chapter 7, the best interest test is satisfied. The best interest test does not import or authorize statutory subordination in chapter 11.

Debtors objected to the Camara Creditors' claims and argued that § 1129(a)(7)(A)(ii) provided the applicable law under which they reserved their right to subordinate the Camara Creditors' claims for punitive damages. As discussed above, it did not. Section 1129(a)(7)(A)(ii) only required that those creditors who did not accept the plan would receive at least as much as they would in a hypothetical chapter 7 distribution. Section 1129(a)(7) simply does not create a statutory right of subordination or incorporate § 726(a)(4).[18] Debtors cannot reserve a right that never existed.

---

[18] Even under Debtors' reading of § 1129(a)(7), any subordination of punitive damages should have been addressed in their plan as it relates only to the best interest

34

test and is not an independent basis for subordination. Under *Espinosa,* Debtors may not now seek to challenge the plan they confirmed in contravention of their own assurances that the plan satisfied the best interest test.